## FRANCE v. CONNOR *et al.*[1]

(June 1, 1891.)

DOWER — TERRITORY OF WYOMING — EDMUNDS-TUCKER ACT.

Act Cong. March 3, 1887, (Edmunds-Tucker Act,) entitled "An act to amend" certain legislation against polygamy in the territories, provides in section 18, par. *a*, that "a widow shall be endowed of a third part of all the lands whereof her husband was seised of an estate of inheritance at any time during the marriage." Paragraph *b* provides that the widow of an alien shall have dower in her husband's lands if she be an inhabitant of "the territory" at the time of her husband's death. Sections 15-25, excepting section 18, by their terms relate exclusively to Utah territory. Other sections expressly relate to all the territories. *Held,* that section 18 related exclusively to Utah territory, and did not give dower in lands in Wyoming territory to the widow of the owner; dower having been abolished by the Wyoming statute, (Rev. St. Wyo. § 2221.)

Error to district court, Carbon county; SAMUEL T. CORN, Judge.

Petition by Amanda W. France against John W. Connor and William R. Brown for the assignment of dower. Demurrer sustained. Plaintiff brings error. Affirmed.

*C. N. Potter,* for plaintiff in error. *John W. Lacey* and *Brown & Arnold,* for defendants in error.

GROESBECK, C. J. The following facts appear in the petition of the plaintiff in error: She was married to James France, February 7, 1887, and he died intestate, August 21, 1888, leaving her, his widow, surviving him. March 16, 1888, James France, being then insolvent, executed and delivered to the defendants in error a deed of assignment, under the laws of Wyoming territory, of all of his property not exempt from execution, including realty of considerable value, situate in the county of Carbon, for the benefit of all of his creditors. The assignees have since been in the possession of all of the assigned property. Mrs. France did not join in the deed of assignment, and brought suit in the district court of Carbon county for the admeasurement and assignment of dower in the realty so assigned, and for an accounting of all the rents, issues, and profits thereof since the death of her husband, to the end that she may have her dower rights therein, which she claims. The assignees, defendants in error, demurred to this petition on the grounds that the court was without jurisdiction to grant the relief prayed for, and because the petition does not state facts sufficient to constitute a cause of action. The demurrer was taken under advisement by said district court, the Honorable SAMUEL T. CORN, then associate justice of the supreme court of Wyoming territory, presiding as judge of said court, and the demurrer was thereafter sustained by the district court. Mrs. France excepted thereto, and failing, and not desiring to plead further, judgment was rendered for the defendants in error, and she prosecutes proceedings in error in this court.

The plaintiff in error in the court below and in this court and in the brief and argument of her counsel asserted her right

---

[1] Motion for rehearing denied June 30, 1891. Appealed to the United States supreme court.

France v. Connor.

to dower under section 18 of an act of the congress of the United States known as the "Edmunds-Tucker Act," entitled "An act to amend an act entitled 'An act to amend section fifty-three hundred and fifty-two of the Revised Statutes of the United States, in reference to bigamy, and for other purposes,' approved March twenty-second, eighteen hundred and eighty-two."

Dower and tenancy by the curtesy were abolished at a very early day in the territory of Wyoming by an act entitled "An act regulating descent and distribution of property," approved December 10, 1869, which was incorporated with slight amendments in the Revised Statutes of Wyoming for 1887, and is found in section 2221 thereof, in the following language: "Dower and the tenancy by the curtesy are abolished, and neither husband nor wife shall have any share in the estate of the other, save as herein provided." It is by the terms of section 18 of this Edmunds-Tucker act that plaintiff is entitled to dower, if at all, as it is conceded that she is not entitled thereto under any law of the territory of Wyoming. Although not mentioned in the brief of counsel, we deem it proper to state that the legislative assembly of Wyoming passed a statute, approved March 9, 1888, which, among other things, made provision for the release of dower and all rights of the wife in the lands of the husband, mainly in cases of homestead, and providing a simple method of procedure where the wife is insane. The statute does not confer or recognize the right of dower, but, on the contrary, expressly disclaims such a purpose. The closing section of the statute is as follows: "Nothing herein contained shall, of itself, be deemed to confer upon any married woman any dower interest in the lands of the husband; but whenever and so long as any such right of dower exists by virtue of the laws of congress or otherwise, the same may be relinquished, released, or barred, as herein provided." Sess. Laws Wyo. 1888, c. 75, p. 167. It is necessary, therefore, to review the history of the legislation of congress germane to the general object and purview of the act, to ascertain the mischief sought to be remedied by this legislation, and the reasons that impelled congress to enact the various laws to check, restrain, and punish the practice of polygamy. The first attempt of congress in this direction was the enactment of the anti-polygamy act, entitled "An act to prevent the practice of polygamy in the territories of the United States and other places, and disapproving and annulling certain acts of the legislative assembly of the territory of Utah," approved July 1, 1862. This act has three sections. The first defines the offense of bigamy, and prescribes the penalty therefor, and by the express terms of the section the law applies to the territories of the United States, and to any other place over which the United States have exclusive jurisdiction. This section became section 5352 of the Revised Statutes of the United States. Section 2 annuls an ordinance of the provisional government of the so-called "State of Deseret," incorporating the Church of Jesus Christ of Latter-Day Saints, validated by an act of the legislative assembly of the territory of Utah, and all other acts and parts of acts of said legislative assembly which "establish, support, maintain, shield, or countenance polygamy." Section 3 limits the value of real property to be held in any territory of the United States by any religious corporation or association to the sum of $50,000. This last section became section 1890 of the Revised Statutes of the United States. This anti-polygamy act remained in force as originally enacted for nearly 20 years, when it was amended by what is known as the "Edmunds Law," entitled "An act to amend section fifty-three hundred and fifty-two of the Revised Statutes of the United States, in reference to bigamy, and for other purposes," approved March 22, 1882, (22 U. S. St. at Large, c. 47, p. 30.) This act contains nine sections, but only the first and second sections are amendatory of the original act. Section 1 amends section 1 of the anti-polygamy act, (section 5352, Rev. St. U. S.;) and section 2 has a saving clause as to offenses committed prior to the passage of this amendatory act. The other sections, except the last which is numbered 9, relate to the defining of the offense of unlawful cohabitation, the method of procedure in the courts in the prosecution of the cognate offenses of polygamy and unlawful cohabitation, the qualification of jurors, a provision for the amnesty of offenders convicted under prior laws, legitimates the issue of Mormon marriages born prior to January 1, 1883, disqualifies polygamists and bigamists as voters, and makes them ineligible to hold office or any place of pub-

lic trust. Section 9 provides for a board or commission, to be appointed by the president of the United States, by and with the advice and consent of the senate, to have control and charge of elections and registration in Utah, etc.

The next law on this subject is found in the act, which took effect without the signature of the president, March 3, 1887, which is familiarly known as the "Edmunds-Tucker Act," the title to which is quoted supra. It has 27 sections, and the subject-matter of the act is much broader than the title. It is not wholly amendatory of the Edmunds law of March 22, 1882, but contains many other matters foreign to the object and scope of the act as expressed in the title, which does not contain the clause "for other purposes," which is inserted therein only as part of the title of the Edmunds law. The act is a mosaic of legislation, and its loose arrangement is a powerful argument in favor of the wise provision of the constitutions of many of the states, which does not appear in the federal constitution, that no bill, except general appropriation bills and bills for the codification and general revision of the laws, shall be passed containing more than one subject, which shall be clearly expressed in the title. Grouping the sections in some sort of system, it will be observed that 16 sections, (6, 7, 8, 11, 12, 15, 16, 17, 19, 20, 21, 22, 23, 24, 25, and 27,) by the express terms of each, respectively, apply only to the territory of Utah. In the above-indicated order they repeal laws of Utah providing that prosecutions for adultery can only be commenced on the complaint of the husband or wife; enlarge the powers and jurisdiction of the court commissioners appointed by the supreme and district courts of Utah; enlarge the powers of the United States marshal for Utah, and his deputies; repeal laws of Utah giving illegitimate children capacity to inherit from the father; repeal laws of Utah conferring jurisdiction on probate courts, or judges thereof, other than matters of administration of the estates of decedents, and the guardianship of persons and property of infants and those of unsound mind; repeal laws of Utah incorporating the Perpetual Emigration Fund Company; dissolve that corporation, and prohibit the reincorporation thereof, or of associations of like character; require the attorney general of the United States to institute proceedings in the supreme court of Utah to carry into effect the provisions of section 15, and to dispose of the property of said corporation mentioned therein; repeal the act of the legislative assembly of Utah, and of the so-called "State of Deseret," incorporating, continuing, or providing for the Mormon Church; dissolve said corporation, and require the attorney general to institute proceedings to wind up its affairs, etc.; provide for the appointment of judges of the probate courts in Utah by the president, by and with the advice and consent of the senate, and annul laws of Utah providing for the election of such judges; repeal laws of Utah authorizing women to vote, and prohibit their voting in that territory; repeal laws of Utah providing for the numbering and identifying of the ballots of electors at any election; provide for the redistricting of Utah, and the apportionment of representation in the territorial legislature, and that none but citizens of the United States shall vote at any election in said territory; continue in force the provisions of section 9 of the Edmunds law of March 22, 1882, referring to the registration of voters and the elections in Utah, until by suitable legislation of the legislative assembly thereof the provisions of the law are re-enacted and approved by congress; prescribe qualifications for voting and holding office in Utah, and a test oath for voters, officers, and jurors therein; abolish the office of territorial superintendent of district schools, created by the laws of Utah, and require the supreme court of that territory to appoint a commissioner of schools, with the same powers and duties exercised by such superintendent, and with additional powers and duties, prescribed by the act; and suspend the laws of Utah for the election and appointment of such officer last named; and repeal the militia laws of Utah. Six sections of the act (1, 2, 3, 4, 10, and 18, the dower section) do not express where they apply in direct terms, but it may be easily gathered from the context of the original and amendatory acts that all but the last section named, 18, are applicable to all of the territories. Sections 3, 4, and 5 enlarge the number of offenses that may be prosecuted and punished, and were enacted, doubtless, to shut off not only polygamy, where proof might be difficult to obtain, but all acts of unlawful sexual intercourse, as these sections define the cognate offenses of adultery, incest, and fornication, and prescribe penalties therefor. Section 10 is in

France v. Connor.

the nature of a proviso to section 9, and saves the right to introduce other legal proof of marriages than the record thereof provided in said section 9, and made *prima facie* proof of the facts therein stated; while sections 1 and 2, respectively, make the husband or wife of the accused a competent witness, under certain restrictions, in all prosecutions for bigamy, polygamy, or unlawful cohabitation, and provide for a summary method for securing the attendance of witnesses in such prosecutions. Four sections of the act, (9, 13, 14, and 26,) by the express terms of each, respectively, apply in any or all of the territories. They provide for the certifying of all marriages solemnized in the territories, and for the record thereof; for proceedings to forfeit the property of religious corporations or associations obtained or held in excess of the limit of $50,-000; and in violation of section 3 of the anti-polygamy act of July 1, 1862, (Rev. St. U. S. § 1890,) and for the escheat thereof; for summary process to compel the production of all books, papers, documents, and records of such corporations or associations; and provide for the appointment of trustees to hold the real property of such religious corporations, and the manner of such appointment. Nine sections of the act (6, 11, 12, 15, 17, 19, 20, 21, and 27) repeal or annul in express terms laws of Utah on subjects named therein, showing conclusively that congress had full knowledge of the terms of the laws of Utah deemed obnoxious, and by it disapproved and annulled. Section 11 of the act annuls and disapproves laws of Utah which provide for or recognize the capacity of illegitimate children to inherit or to be entitled to any distributive share in the estate of the father, saving the rights of all illegitimate children legitimated by section 7 of the Edmunds act of March 22, 1882, and of illegitimate children born 12 months after the passage of the act (the Edmunds-Tucker law.) No section of the act modifies or changes in any way, by express terms or by any inference, the laws of descent or distribution of any territory except that of Utah.

This leaves for consideration the dower section, numbered 18, which does not state where it applies. It was undoubtedly borrowed from the laws of New York relating to the dower of widows, as appears from the 17th Congressional Record 49th Cong. pt. 1, p. 457, (proceedings of the senate of January 6, 1886.) Senator Edmunds,

the author of the senate bill, recognized this source of the dower section, as he stated, on moving certain amendments thereto, that paragraph *a* of said section, (then section 25 of the bill,—senate bill 10,) was, he believed, "taken verbally from the laws of the state of New York, which are very much like the laws of other states." A comparison of the New York statute with section 18 of the Edmunds-Tucker act discloses that but few changes were ingrafted on the New York law. The words, "unless she shall have lawfully released her right thereto," in paragraph $a^1$ of section 18, were added as a measure of precaution; and where reference is made in the body of the section to a mortgage, there is added, "or conveyance in the nature of a mortgage;" and where the word "mortgagee" is found in like situations, the words, "or grantee in such conveyance," are added; but, notwithstanding these modifications, and another which we shall presently examine, it is apparent that the structure of this dower section is based upon the New York statute, of which it is almost an exact copy. In paragraph *b* of the dower section the words "this state" as they appear in the New York statute are stricken out, and the words "the territory" inserted in lieu thereof. As we think that this paragraph, which is the only guide or reference in this disputed section to the locality where the same applies, will materially aid in the construction of the entire section, we quote the paragraph in full: "(*b*) The widow of any alien who, at the time of his death, shall be entitled by law to hold any real estate, if she be an inhabitant of the territory ["this state" in the New York statute] at the time of such death, shall be entitled to dower of such estate in the same manner as if such alien had been a native citizen." The borrowed law applied to but one jurisdiction,—"this state." Is it not plain to be seen that the one who drafted the bill intended by striking out these words, and inserting in their place "the territory," that the section should apply to but one jurisdiction,—"the territory" he had in his mind at the time? Contrasted with the language employed in three acts of congress,—the anti-polygamy law, the Edmunds and the Edmunds-

---

[1] Section 18, par. *a:* "A widow shall be endowed of third part of all the lands whereof her husband was seised of an estate of inheritance at any time during the marriage, unless she shall have lawfully released her right thereto."

Tucker acts,—it appears that when congress legislated for all of the territories it did so in the act in express terms, and it so spoke when legislating for some particular territory. This has been the custom of congress in its acts relating to all or any of the territories, not only in the acts we have been considering, but in all of its legislation of many years concerning the territories. So it was held by the supreme court of the District of Columbia in the case of U. S. v. Crawford, 12 Cent. Rep. 404, that these acts which we are considering, although containing the language, "in a territory of the United States, or other place over which the United States have exclusive jurisdiction," did not apply to the District of Columbia, and that a prosecution for fornication under section 5 of the Edmunds-Tucker act could not be maintained under the law in said jurisdiction, inasmuch as the history of legislation in reference to that district shows that, where congress intended to legislate therefor, its habit has been to do so in express terms; and this decision was rendered in the face of the fact that congress has exclusive jurisdiction over the said district. When congress limits the operation of any law to a particular district or districts, it has invariably, we believe, pointed out specifically the locality or localities where the legislation is meant to apply. In all such cases we think that the presumption would be that any given locality is not within the operation of the statute, unless clearly made so upon the face of the act itself. This seems to be the theory of the case just quoted. It is urged that these words, "the territory," should be so construed as to mean the territory in which the real estate is situate, and not the territory of Utah; but we find in the act that, where such words were necessary to make clear the meaning, they were carefully inserted. In section 13 of this Edmunds-Tucker act it is made the duty of the attorney general of the United States to institute proceedings to forfeit and escheat to the United States the property of corporations and associations held in violation of the acts of congress; and this section also provides that "all such property so forfeited and escheated to the United States shall be disposed of by the secretary of the interior, and the proceeds thereof applied to the use and benefit of the common schools in the territory in which such property may be." Such care exercised in one portion of the act is strik-

ing and significant, as it shows the intent and purpose of congress in harmony with its habit, as, when a provision is made for the benefit of or applicable to any or all of the territories, it is so stated or may be easily gathered from its enactment. It is further argued with considerable ingenuity that this dower section is separately written, like other parts of the bill, and that the subjects embraced in the different sections were strung together without logical sequence or any proper classification of subjects; and that the fact that Utah, and no other territory, is specifically mentioned in the preceding section 17, wherein the incorporation of the Mormon Church is dissolved, and proceedings provided for the winding up of its affairs in the courts of Utah, and that section 19, following, provides for the appointment by the president, by and with the advice and consent of the senate, of all judges of the probate courts in Utah, and disapproves and annuls all laws of that territory which require the election of such judges, has no bearing in the construction of this section 18. This view we do not entertain, as we believe that it is not in harmony with the principles governing the legal construction of an act. Not only is each portion of an act to be construed with every other portion, but the entire act is to be construed in connection with all other acts *in pari materia*. The division of an act of congress into sections does not interfere with this principle of construction.

The division of legislation by different sessions of congress separated by many years does not vary the rule; nor does the division of legislation into different acts interfere with it. It is contended that sections which do not have within themselves a limitation of their application apply "throughout the entire jurisdiction over which congress may legislate," and that sections 3, 4, and 5 of the Edmunds-Tucker act do so apply, because not so limited. We have already indicated our views on that point, but we may say further that we do not consider it a safe rule to follow in the construction of congressional legislation. A better reason may be found why these sections 3, 4, and 5 apply in all of the territories (not throughout the entire jurisdiction over which congress may legislate) than the reason given in the general language of the sections. Why should each section specify the extent or limit of its application? Where a lim-

France v. Connor.

itation is once ascertained and clearly defined, what necessity is therefor repeating it in legislation upon the same subject, until the limitation is changed, whether the legislation is all in the same section, or in the same act, or of the same year, or by the same congress, or whether it is in many sections, or in many acts, of many years, by many congresses? The limitation may be expressed over and over again, as it often is; but is this necessary? Sections 1 and 2 of the act, general in terms, are doubtless applicable in all of the territories, because they make specific provisions in certain proceedings, examinations, and prosecutions marked out in the act to which this Edmunds-Tucker act is amendatory, and which are applicable in all of the territories. Sections 3, 4, and 5 apply to the same territorial extent, because of the natural and logical connection of the language as well as the subject-matter, and because they define and prescribe a penalty for cognate offenses to those of polygamy and unlawful cohabitation, defined in the last preceding act. There is nothing to indicate an intention to make any change in the jurisdiction where these parts of the act apply. The numbers of the sections interpolated are insignificant, and do not of themselves change the meaning of the significant words of the section, or affect them in any way. This division of a law into sections is purely arbitrary, and is controlled by no rules of grammar, logic, or law, and is made merely for convenience of reference, and is no more a part of legislation than mile-stones are a part of the highway. So of section 18,—the dower section. The language is not to be severed from its actual and natural connection with what follows and what precedes it. If the words "Sec. 18" had been omitted, and had not been inserted until the point where "Sec. 19" is placed, there would have been no question raised. What effect can these words, "Sec. 18," have upon the meaning of the effective language of the act? This brings us to the consideration of the relative words, "the territory," and we must ascertain what territory is meant. All language is relative to and dependent upon other language employed in the same and immediate connection. The expression quoted is relative in a more specific and in a grammatical sense, and the rule for our guidance in this particular is not a doubtful one. The authorities appear to be numerous and harmonious to the effect that "relative and qualifying words and phrases, grammatically and legally, where no contrary intention appears, refer solely to the last antecedent." Suth. St. Const. § 267, and the authorities there cited. The last antecedent territory is Utah. Why do not the relative words "the territory" refer to the last antecedent? Where does the contrary intention appear? In the original bill, as it passed the senate, the dower section was the last section of the bill, and followed section 24 thereof, which declares vacant the office of territorial superintendent of district schools, created by the laws of Utah, and provides that the supreme court of the territory shall appoint his successor, etc. This provision, somewhat modified, has been incorporated in section 25 of the act. In the house bill, which was passed as a substitute for the senate bill, the dower section was numbered 22, and followed a section annulling and declaring void all laws passed by the general assembly of Deseret, or by the legislative assembly of Utah, granting and confirming any water, timber, or herd rights on any part of the public domain, or any special privilege therein, to any person or any civil or ecclesiastical corporation or association, etc., which was eliminated from the bill by the conference committee, and preceded a section relating to the formation of new election districts in Utah, and providing for the new apportionment for members of the Utah legislature. Vide 18 Congressional Record, pt. 1, pp. 581-583. Hence it appears that in every arrangement of the bill and its subdivisions into sections in all of the mutations of legislation this dower section either followed a section or was imbedded between sections in terms applying only to the territory of Utah.

But we may decide this question upon broader grounds, that appear to us to be conclusive. At the time of the passage of the Edmunds-Tucker law there were eight territories of the United States, viz., Arizona, Dakota, Idaho, Montana, New Mexico, Utah, Washington, and Wyoming. Montana alone had dower, and it had been abolished by statutes that had stood for many years in Dakota, Idaho, Utah, and Wyoming. Comp. Laws Utah 1876, § 1022, found in section 2530, Comp. Laws 1888; Comp. Laws Dak. 1887, § 3402; Rev. St. Idaho, c. 3, tit. 2, §§ 2493-2512, Revision 1887; Rev. St. Wyo. 1887, § 2221. In

France v. Connor.

Arizona, Idaho, New Mexico, and Washington the law of community property prevailed, to which the Pacific states and territories have clung with so much persistency. It came in with the law of France and Spain, and is a legacy of the Louisiana purchase and the Mexican accession. The central or fundamental idea of the community system is that marriage creates a partnership in property between husband and wife, and that all property resulting from the labor of both or either of them, except by gift, devise, bequest, or descent, called "*acquets*" or "acquest property," inures to the benefit of both of them; and, though community property has not all the incidents of partnership property, it has many of them, and is commonly spoken of as partnership property. With some changes, such as making provision for the seggregation of the separate property of either spouse from the community property, and other slight modifications, this law is not only in force in these jurisdictions along the Pacific coast, but has found deep root in the legislation of the states of Texas and Louisiana. The system is a child of the civil law, and is not recognized by the common law.

In Washington it seems that the husband cannot incumber or sell the community real estate unless the wife join in the deed or other instrument of conveyance by which it is conveyed or incumbered; and upon the death of the husband or wife the survivor has one-half of the community property, freed from all but the community debts, and the other half is subject to the testamentary disposition of the husband and wife, subject to the community debts. In Idaho the husband has management and control of the community property, with the like absolute power of disposition (other than testamentary) as he has of his separate property or estate; but such disposition does not extend to the homestead occupied or used by the husband or wife as a residence. In Arizona the husband only may dispose of the community property during coverture. In all of these seven territories where dower was abolished, or where community property was substituted for it, the most liberal provisions exist as to homestead rights, and the consent of the wife must be had to sell or incumber the homestead, the value of which ranges from $1,000, in Washington, to $5,000, in Idaho. The widow is given a large share of her husband's estate where he dies intestate. Where there is a surviving child or children she is given a moiety of the estate, in some of these jurisdictions; in others, one-third; and, in the event of no issue surviving the deceased husband, she has even a larger share of the estate; so that in these territories she was dealt with far more graciously than at the common law. Rev. St. Ariz. 1887, §§ 1460, 2100-2102; Comp. Laws N. M. 1884, §§ 1411-1414, 1422; Comp. Laws Dak. 1887, §§ 2594, 3401, 3402; Code Wash. 1881, §§ 342-348, 2400-2417, and Laws 1887-88; Rev. St. Idaho, §§ 2493-2512, pp. 307-309, and Id. pp. 363-366, 606-609, 645-649; Comp. Laws Utah 1876, §§ 700-732.

In Wyoming the homestead can only be sold or incumbered with the consent of the wife, she being required to join in the mortgage or deed; and the right of homestead is to the extent of $1,500, the proceeds upon the sale thereof being exempt from execution or attachment, as well as the homestead itself. The homestead, with a considerable amount of the property of the decedent, is set apart to the widow, and does not pass into administration. If the husband die intestate, the widow receives one-half of the estate if there be a surviving child or children, or the descendants thereof; and if there be none, all of it, if the same does not exceed in value $10,000; and, if above that amount, she receives three-fourths of the estate, and the other heirs named in the act one-fourth. Rev. St. Wyo. §§ 2063, 2064, 2122, 2780, 2789. It may be true that in Wyoming, and probably in some of the other territories existing at the time of the passage of the Edmunds-Tucker law, a profligate husband might dispose of, by will, his entire property, except the homestead, and thus leave the widow without means; but such could not be the case in Washington or Idaho, and probably in other of the seven territories named. There the right of community property vesting in the wife could not be the subject of testamentary disposition. It is incredible that congress, knowing all these laws, could have intended to confer a lesser right on married women in those territories which provided more generously for them than the Edmunds-Tucker law. Its anxiety was to protect the first or lawful wife of Mormon or plural marriages, and this appears plainly in the report of the conference committee of the senate and house on the various bills, as a paragraph added to the dower section was stricken

France v. Connor.

from the act, and this provided that the term "lawful wife," referred to in the section as it now stands, should be held to mean, in all cases of Mormon or plural marriages, the first wife, and that such wife only should be entitled to dower, under the act, on the death of her husband. The reason for striking this clause from the bill was stated to be that it was best to leave that matter to the courts. 18 Congressional Record 49th Cong. pt. 1, p. 583, and Id. pt. 2, p. 1879. Dower was conferred by this act to protect the first wife by offering to her and her children privileges which were denied to them under the laws of Utah, and to prevent the husband there from making such testamentary disposition as to exclude the first wife and the legitimate children, or to force her and her children to share the property with the other wives and children of a polygamous marriage.

The law of Utah on the subject of distribution of, and the right of succession to, the estates of deceased persons at the time of the passage of the Edmunds-Tucker law was as follows: "Sec. 25. Illegitimate children and their mothers inherit in like manner [as legitimate] from the father, whether acknowledged by him or not: provided, it shall be made to appear to the satisfaction of the court that he was the father of such illegitimate child or children." Comp. Laws Utah 1876, § 677. This act was declared valid and binding, and an illegitimate child was allowed to inherit his share of his deceased father's estate, by the decision of the supreme court of the United States in the case of Cope v. Cope, 137 U. S. 682, 11 Sup. Ct. Rep. 222; it being held that the Edmunds-Tucker law expressly saved such rights by the proviso to the eleventh section thereof. There was no such act in any other territory, and it seems clear to us that this dower section was aimed solely at the condition of affairs existing in Utah. Congress did not surely, while legislating to protect the lawful wife in Utah, intend to supplant the beneficent provisions of the laws of those territories which had with a free hand bestowed the right of community property upon the lawful wife. It did not intend to strike down any of the rights which married women possessed there; and to grant this to be true is to concede that the law does not apply, and was never intended to apply, to Wyoming, as it must apply to all of the territories or to Utah alone. The aboli-

tion of dower in the territories where the law of community property did not prevail was probably caused by a desire to remove all restraint from alienation, except in the territory of Utah, where illegitimate children and their mothers were allowed to inherit, and where the practice of plural marriage was covertly upheld and boldly recognized in the statutes.

The Wyoming law was borrowed from Colorado, where it is found on the statute-books to-day, and was followed by a more valuable gift than the right abrogated, as the innovation was condoned by granting to the widow a larger share in the estate of her intestate husband than was bestowed by the common law, and by enlarging her rights as a *feme covert*, so circumscribed by the common law.

If the position be taken that the act conferring dower did not repeal the laws relating to community property where they had sway, it will readily be seen that such legislation would have been a fruitful source of litigation, an absurd attempt to ingraft the dower right of the common law upon the unfriendly and alien root of the civil law, and to give to the widow a disproportionate share in her husband's realty,—a position that need but to be stated to show its absurdity. Congress must be presumed to have known the *status* of all this diverse legislation in all of these jurisdictions at the time of the enactment of the Edmunds-Tucker law. A statute is always construed with reference to the intent of the legislative power; and to arrive at that intent the courts always first undertake to ascertain the mischief which the legislature had in view, and which they desired to correct.

An examination of all these statutes relating to the practice of polygamy shows that the purpose of congress was to destroy it in the territory of Utah, where it was chiefly intrenched. U. S. v. Crawford, supra. It did not intend to upset the laws of seven jurisdictions where polygamy had not gained such a foothold, or to throw into them an apple of discord, to be fought over in the courts. It had wisely provided in its legislation regarding certain of the territories that the laws passed therein should be submitted to congress, and, if disapproved, the same should be null and void. Rev. St. U. S. § 1850. It provided further, that in all of the territories a copy of the laws and journals of the legislative assembly, within 30 days after the end of each session

thereof, should be transmitted to the president, and that two copies of the laws, for the use of congress, should within the same period be forwarded to the presiding officer of each house of congress. Id. § 1844. The object of these provisions was to keep the executive and legislative departments of the federal government constantly apprised of all territorial legislation, to the end that, if the same or any part thereof was objectionable to congress. it might be repealed or amended. Clinton v. Englebrecht, 13 Wall. 446; Bank v. State, 12 How. 8. An inspection of the congressional debates upon the bill which culminated in the Edmunds-Tucker act discloses that none of the laws of the different territories upon the rights of married women, community property, or succession or distribution of the estates of decedents were discussed, or even mentioned, save, perhaps, as to Utah. There was not the slightest indication of any dissatisfaction in the minds of the national legislators, some of whom were able jurists, with the laws of any territory upon these subjects, except as to the laws of Utah. One may look in vain in the discussions upon the bill for any design, intent, or purpose to annul or modify any law of any territory except Utah in these respects. The action of congress on the bill is properly denominated in the Congressional Record, "Polygamy and Affairs in Utah," and the course and tenor of all the debates plainly indicate that these subjects alone received the attention of congress in the two years of the gestation of this statute. Moreover, congress seems to have been extremely anxious, even in the case of legislation in Utah, to preserve the rights of illegitimate children there, for it enacted as a proviso at the end of section 11 of the act that said "section shall not apply to any illegitimate children born within twelve months after the passage of this act, nor to any child made legitimate by the seventh section of the act of March 22, 1882." This solicitude of the law-making power was recognized in the remarkably clear and able opinion of Mr. Justice BROWN in the case of Cope v. Cope, supra, which may well be quoted as an authority in favor of many of the propositions we have laid down herein. Such tender solicitude as to existing rights which this act breathes concerning "affairs in Utah" shows the disposition that congress had in the passage of this act, and it certainly ought to have had the same paternal regard for

v.3wyo.—17

other communities which had been planted with so much care on the frontier. The whole current of congressional legislation, ever since territories have been created, concerning them and their internal affairs, has been to disapprove and annul laws objectionable and displeasing to congress by express terms, and not by any implication; and the same course is pursued in the act before us. Why should such care be exercised in regard to Utah, and not to other territories? It seems clear to us that, none of the laws of the territories other than Utah having been disapproved or annulled on the subjects of dower, community property, or succession, congress never intended to disapprove and annul them. To hold otherwise is to stretch the rules of construction to an unreasonable length, and to be blind and deaf to the history of all congressional legislation concerning the territories. Nay, more, it is to say that congress has set aside, without reason, and by inference and implication, the great right of home rule, of dealing with "rightful subjects of legislation," vested in territorial legislatures, and only withdrawn in extreme cases.

We cannot extend the application of this dower section to embrace this jurisdiction in common with others, without being against reason and precedent. It is true that the supreme court of the state of Montana, in the case of Chadwick v. Tatem, 23 Pac. Rep. 729,[1] held that the Edmunds-Tucker act conferred dower in the territory of Montana and in other territories, but the learned counsel for the plaintiff in error, with commendable frankness, admitted that he had learned upon inquiry that that point had not been raised in the brief of counsel or argued before that court. With all due deference to the learned judge who delivered the opinion of the court in that case, we think that an examination of the opinion will show that such a statement was not necessary to the decision of the question, as the court held that the law of Montana conferring dower had not been repealed by the codification of the statutes of that territory, and because it appears that the inchoate right of dower had become consummate long before the passage and taking effect of the Edmunds-Tucker act.

It has been held in a recent case before the supreme court of the United States that in all cases of ambiguity, the contem-

[1] 9 Mont. 354.

France v. Connor.

poraneous construction not only of the courts, but of the departments and even of officials whose duty it is to carry the law into effect, is controlling. Schell's Ex'rs v. Fauché, 138 U. S. 562, 11 Sup. Ct. Rep. 376. In the opinion of the court a case (Stuart v. Laird) is cited from 1 Cranch, 299, 309, where it was held that a practical construction of the constitution of the United States that the justices of the supreme court had a right to sit as circuit judges, although not appointed as such, was not open to objection. Says the court: "It is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled." In the case of Clinton v. Englebrecht, 13 Wall. 446, supra, in passing upon the question of following in the federal courts the laws of the territory wherein the same are held relating to the impaneling of jurors, the court says: "This uniformity of construction by so many territorial legislatures of the organic acts in relation to their legislative authority, especially when taken in connection with the fact that none of these jury laws have been disapproved by congress, though any of them would be annulled by such disapproval, confirms the opinion, warranted by the plain language of the organic act itself, that the whole subject-matter of jurors in the territories is committed to territorial regulation." Vide Martin v. Hunter, 1 Wheat. 304; Cohens v. Virginia, 6 Wheat. 264; Cooley v. Port-Wardens, 12 How. 299; Lithographic Co. v. Sarony, 111 U. S. 53, 4 Sup. Ct. Rep. 279; The Laura, 114 U. S. 411, 5 Sup. Ct. Rep. 881, (Pollock v. The Laura.) The construction of this act—the Edmunds-Tucker law—in relation to the application of the dower section thereof to the territories by jurists and legislators of the territories affected ought, we think, to have a controlling effect. It is a contemporaneous construction of the highest character, and falls within the decisions above cited. In Utah alone, in its Compilation of 1888, is section 18—the dower section—recognized as part of the law. There has been no legislation in the other territories affected, adjusting their statutes to this new condition of affairs, if it existed; and this omission is convincing proof that the said section is not re-

garded as in force in those jurisdictions. Washington has amended her community property act by providing, among other things, that the husband or wife may convey to the other his or her share of the community property; and this was done by an act approved February 2, 1888, nearly a year after the Edmunds-Tucker act took effect, and while Washington was yet in its territorial condition. The Compilation of Dakota, while containing its organic act, and the provisions of the Revised Statutes of the United States relative to it and common to all of the territories, including certain sections of the Edmunds-Tucker act, does not refer to the dower section. The law of Arizona relating to the rights of married persons was submitted by the commission revising her laws, was passed by her legislature, and received the approval of her governor, February 28, 1887, nine days after the Edmunds-Tucker law came into the hands of the president, and when its provisions must have been known to the entire country. The laws of that territory relating to descent and distribution were approved March 8, 1887, five days after the taking-effect of the said act of congress. The Revision of Idaho went into effect after this act became a law. In all of the territories except Utah, where the dower section probably applies, and in Montana, where dower existed at the time of the passage of the act, the utmost disregard has been manifested as to this section, which, if it were a law, would be fraught with so much interest to the people. We cannot imagine such an apathy on the part of lawyers and laymen if the section conferred dower in these jurisdictions; and this palpable disregard of the section plainly indicates that it is not considered applicable where it has been so profoundly ignored. Taking into consideration, therefore, the inherent evidences of the act itself, the history of legislation of congress for the territories, the legislation on the subject of polygamy, the construction of the dower section, the source from whence it was derived, the status of the laws of the different territories at the time of the passage of the Edmunds-Tucker act, and the construction evidently put upon the disputed section, we reach the conclusion that said section 18 of said act, relating to the dower of widows, did not confer dower upon married women in the late territory of Wyoming, and was not at any time applicable to said territory. This cause was

pending for a long time in the supreme court of the territory, and it is important that the grave questions involved in the case should be speedily settled. The judgment of the district court of Carbon county for the defendants in error is affirmed.

MERRELL, J., having been of counsel in kindred cases, and announcing in open court his disqualification, under the provisions of section 6 of article 5 of the constitution of this state, the Honorable RICHARD H. SCOTT, judge of the district court of judicial district No. 1, was called in by the remaining judges of this court, and sat with them in the hearing of this cause.

CONAWAY and SCOTT, JJ., concur in the foregoing opinion.