[APRIL TERM, 1913.]

# GROVER IRRIGATION AND LAND COMPANY v. LOVELLA DITCH, RESERVOIR AND IRRIGATION COMPANY.

## (No. 705.)

APPEAL AND ERROR—RULING ON DEMURRER—EXCEPTION—NECESSITY OF BILL OF EXCEPTIONS—PLEADINGS—DEMURRER—WAIVER—PLEADING—PETITION—INSUFFICIENCY—OBJECTIONS—DEFECTIVE PETITION —RAISING QUESTION FIRST TIME ON APPEAL—DEMURRER—REVIEW OF ORDER OVERRULING DEMURRER—ADMISSION OF FACTS BY DEMURRER—ANSWERING OVER—EFFECT OF—EMINENT DOMAIN—DEFINITION—EXERCISE OF POWER—USE IN ANOTHER STATE—TAKING LAND FOR IRRIGATION PURPOSES—LAND IN ANOTHER STATE—STATUTES—CONSTRUCTION.

1. Under the statute (Comp. Stat. 1910, Sec. 4597) providing that when a decision objected to is entered on the record and the grounds of the objection appear in the entry, exception may be taken by the party causing it to be noted at the end of the entry that he excepts, the grounds of objection sufficiently appear in an entry showing a ruling upon a demurrer to a pleading, either sustaining or overruling it, and an exception thereto is properly taken by causing it to be noted at the end of the entry that the objecting party excepts to the ruling; the demurrer constitutes the objection, and, since it is a part of the record proper, a statement of the grounds thereof in the entry showing a ruling upon it is unnecessary, within the meaning of said statute, to

authorize an exception thereto by noting the same at the end of the entry.

2. Where an entry upon the court journal shows that a demurrer to the petition was overruled, and that such ruling was excepted to, a bill of exceptions is not necessary to present such ruling for review.

3. Where the petition fails to state the substance of a good cause of action the defect is not waived by failure to demur, or by answering over after demurrer filed and overruled, unless the defect be aided or cured by the answer or the subsequent proceedings.

4. Where a petition in a condemnation proceeding was demurred to on the ground that it totally failed to state the substance of a good cause of action, the defect was not waived by answering after the demurrer was overruled and the ruling excepted to.

5. While a verdict may aid a defective statement of a cause of action, it will not aid a statement of a defective cause of action, and an intendment which is inconsistent with the allegations on the record will not be made after verdict in support thereof.

6. A pleading of fact, such as an answer, does not admit the sufficiency in law of the facts adversely alleged in a prior pleading.

7. Where a pleading is insufficient in substance, the opposite party may, without demurring, generally avail himself of such insufficiency by objecting to the introduction of evidence at the trial, by motion in arrest of judgment, by motion for judgment *non obstante veredicto,* or by proper proceeding in error.

8. An objection to a petition on the ground of a defect in substance may be made for the first time on appeal, but in such case the pleading objected to will be construed liberally and supported by every legal intendment, and it will be upheld if the necessary facts are fairly to be inferred from the allegations; this rule excluding objections relating merely to the form or manner in which the cause of action is stated.

9. Although a defendant has demurred to a petition on the ground that it is defective in substance, and the demurrer has been overruled, he does not lose the right, which would be his without demurring, to object to the petition on that ground on appeal.

10. An appellate proceeding cannot be taken from an order over-
ruling a demurrer, but only from a final judgment ren-
dered thereon when the party stands on his demurrer
without pleading further, or from a final judgment ren-
dered in the cause after the trial of the issues of fact
where there has been further pleading presenting issues
of fact, but, when reviewing a judgment rendered upon a
trial involving issues of fact presented by subsequent plead-
ings, it is the long established practice in this court held
to accord with the intent and spirit of the code to consider
an exception to an order overruling a general demurrer.

11. Where an order overruling a demurrer is treated, as in this
state, as interlocutory merely, and not, therefore, an order
authorizing the immediate taking of an appeal or proceeding
in error, and the objection is either that the pleading, if a
complaint or petition, fails to state facts sufficient to con-
stitute a cause of action, or that there is a want of jurisdic-
tion of the subject matter, the general rule that error in
overruling a demurrer is waived by pleading over does not
apply.

12. Where, as in this state, an appeal or proceeding in error can
only be taken from a final order or judgment in the case
and the party is permitted to except to the overruling of
his demurrer and then plead over, it is not necessary that
a demurrer be withdrawn upon pleading over, or that it be
treated as withdrawn.

13. A demurrer does not admit the allegations of the pleading
demurred to except for the purposes of the demurrer, the
effect of which is merely to deny the legal sufficiency of
the facts alleged, so that on the overruling of the demurrer
the demurring party may then plead to the facts, and the
demurrer, though remaining on the record, will not after
such subsequent pleading be regarded as an admission of
the facts necessary to be proved to establish the cause of
action or defense upon the trial of the issues of fact.

14. Since the code allows a proceeding in error only from a final
judgment, that judgment, when rendered after the trial of
an issue of fact arising upon a pleading filed after the
overruling of a demurrer, is to be regarded as rendered
upon all the issues in the cause—the issue of law as well
as the issue of fact—or, at least, as a final judgment author-
izing an appellate proceeding to question the correctness of
the decision on the issue of law as well as the issue of fact.

15. Although by pleading over after the overruling of a demurrer and going to trial upon the merits, the party who demurred takes the chances of the suggested defect in the pleading being aided or cured by the subsequent pleadings or proceedings, he retains the benefit of a proper exception taken by him to the ruling on the demurrer.

16. Under the statute (Comp. Stat. 1910, Sec. 4436) providing that after the overruling of a demurrer the party may plead further if the court is satisfied that he has a meritorious defense or claim, and did not demur for delay, when such leave to further plead is given it is full and complete, and upon pleading over after such leave granted the withdrawal of the demurrer will not be implied, where the ruling upon it was excepted to.

17. Eminent domain is the right or power of a sovereign state to appropriate private property to particular uses for the purpose of promoting the general welfare. It embraces all cases where, by authority of the state and for the public good, the property of the individual is taken, without his consent, for the purpose of being devoted to some particular use, either by the state itself or by a corporation, public or private, or by a private citizen.

18. Respecting eminent domain the several states are distinct and independent of each other, respectively possessing and exercising the power for their own purpose or their own public welfare.

19. If the particular improvement or use for which land is sought to be taken under the power of eminent domain will be of sufficient benefit to the people of the state to authorize an exercise of the power, it will not be prevented by the fact that the people of another state will also be benefited.

20. Under the power of eminent domain a state cannot take or authorize the taking of property or rights in property situated in another state.

21. Under Section 32, Article 1, of the Constitution of the State, which provides that private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity, and for reservoirs, drains, flumes or ditches on or across the lands of others, for agricultural, mining, milling, domestic or sanitary purposes, nor in any case without due compensation, a private use for any of the purposes mentioned is given the same force and effect as a public use, but no greater.

22. The exercise of the power of eminent domain for the purpose of irrigation and reclamation of land is founded upon the conditions and necessities of the state where the power is to be exercised, and does not rest upon the necessities or the physical conditions of another state.

23. Where land in this state situated near the boundary line between this state and Colorado was sought to be condemned for a headgate and part of a ditch of an irrigation system to irrigate lands in Colorado near such boundary line, the fact that the irrigation and the reclamation of such land might indirectly benefit some of the people of this state, and that settlers on said lands in Colorado might purchase their supplies from a neighboring city in this state, is not such a benefit to the public of this state as to authorize the taking of the desired land in this state under the power of eminent domain; the only use which could support the exercise of the power will occur not in this state, nor for any purpose of this state, but in the other state where the water is to be applied and the land to be irrigated is located.

24. Under the conditions stated in the last preceding paragraph, it appearing that no land in this state will receive for its reclamation or cultivation any of the water to be diverted or distributed by means of the ditch, but the water is to be entirely devoted to the irrigation of land in another state, the use will be in and for that state—for its use and purpose, and not in this state or for any of its purposes, and, therefore, the principle is applicable, that the power of eminent domain will not be exercised by a state for the use of another state.

25. Another state cannot exercise the power of eminent domain in this state, and any authority conferred by its laws to do so would be void, for the sovereignty of any government is limited to persons and property within the territory it controls.

26. The laws of a state have no extra territorial effect, and it is not necessary for a state statute to contain words expressly confining its operation within the state, since it is generally understood that it is so confined.

27. The statute (Comp. Stat. 1910, Sec. 3874) conferring authority to appropriate and condemn land for a right of way for a ditch for agricultural purposes is intended to be confined not only to a right of way within the state, but also to agricultural purposes within the state; such

authority is conferred to encourage agriculture within the state, and if the legislative power exists to make the authority broader than that, and extend it to agricultural purposes beyond the state boundaries, it should be so extended, if at all, by the legislature, and by words clearly showing an intention to do so.

28. Where it was sought to condemn land in this state for a headgate and ditch to be used to divert and conduct water into the State of Colorado solely for the purpose of irrigating and reclaiming lands situated in that state, near the southern boundary line of this state, Held, that a right to condemn the land in this state was not shown, since no part of the use which would support the right to condemn was to occur in this state, or for any of the purposes of this state.

[Decided April 7, 1913.]                    (131 Pac. 43.)

ERROR to the District Court, Laramie County; HON. RODERICK N. MATSON, Judge.

This was a proceeding for the condemnation of certain land in this state for a headgate and part of an irrigation ditch brought by the Lovella Ditch, Reservoir and Irrigation Company against the Grover Irrigation and Land Company. Judgment was rendered in favor of the petitioner and the defendant brought error. The material facts are stated in the opinion.

Clark & Clark, for plaintiff in error.

The only points desired to be presented arise upon the demurrer to the amended petition. The contention that said petition is insufficient is based upon two grounds:  1. Because the plaintiff acquired no permit from the state engineer authorizing the diversion of any water.  2. Because the proposed use is not public with respect to this state. It is not the law in this state that the necessity of an appropriation of land is left to the decision of the condemning party, nor has that been determined by the Legislature. It is provided by statute (Comp. Stat. 1910, Sec. 3874) that a corporation requiring a way of necessity for an irrigation ditch may condemn so much land as is "necessary therefor." The

petition in a condemnation proceeding must allege the "immediate necessity for the appropriation." (Sec. 3876.) Before commissioners can be appointed to appraise the damages the court must hear the allegations and proofs touching "the immediate necessity of the appropriation," and that question must be determined in favor of the plaintiff. (Id. Sec. 3879). No such showing as that required by the sections of the statute cited can be made in the case of an irrigation ditch in the absence of a valid permit from the state engineer authorizing the construction of a ditch and the diversion of water through it. (Id., Secs. 727, 730.) The right to condemn property is not inherent in any person or corporation; it is a matter of grace on the part of the sovereign, which may refuse it altogether, or in granting it, may annex conditions to its exercise. The right can be exercised only where the proposed use will constitute a public benefit, although it may not be necessary that it be a public use. The digging of a ditch is not a public benefit; the public benefit is found in the irrigation of lands. The party seeking to take property for an irrigation ditch must therefore establish his right to divert water through it. (Castle Rock Irr. C. & W. P. Co. v. Jurisch, 67 Neb. 377, 93 N. W. 690.) The petition does not show the securing of the necessary permit for the construction of the ditch and the appropriation of the water. It shows certain applications and the action taken thereon by the engineer, but it is contended on behalf of plaintiff in error that those proceedings did not amount to such an approval of the application as to give the defendant in error any right whatever. No indorsement made by the engineer upon either of the applications contains the essential elements of an affirmative indorsement specified in Section 732. If it should be held that by the engineer's indorsement the application of the defendant in error was approved, then the question arises whether the engineer has authority under our statutes to issue a permit for the diversion of water in this state to be used for irrigating lands in another state. The authority of the engineer to issue a

permit may be attacked collaterally, since the only right to an appeal is given to the applicant for a permit. (Sec. 733.) Therefore, if the authority to issue a permit can be questioned at all it must be done collaterally.

The proposed use is not public with respect to Wyoming, and will not justify the condemnation of land in Wyoming. The only justification for extending the power of eminent domain to a private use is found in the resulting benefit to the state as a whole. The irrigation of lands in Colorado is in no sense a benefit to this state authorizing the taking of land in this state. (Lewis on Em. Dom., Secs. 1, 282, 310, 315; Mining Co. v. Sewell, 11 Neb. 394; Strickley v. Highland Boy Co., 200 U. S. 527; Potlach Lumber Co. v. Peterson, 12 Ida. 769, 88 Pac. 426; Healy Lumber Co. v. Morris, 33 Wash. 490, 74 Pac. 681; Columbus W. W. Co. v. Long, 121 Ala. 243, 25 So. 702.) In the last case cited it was said to be an admitted fact generally that the power of eminent domain inheres in a state for domestic uses only, to be exercised for the benefit of its own people, and cannot be extended merely to promote the public uses of a foreign state. Citing that case it is said in Lewis on Eminent Domain: "The public use for which property may be taken is a public use within the state from which the power is derived." (Sec. 310.)

*Kinkead & Mentzer,* for defendant in error.

The defendant below having answered after the overruling of its demurrer and allowed the trial to proceed on the merits there can be no review of the ruling upon the demurrer. (Griffin v. Wattles, (Mich.) 78 N. W. 122; 2 Cyc. 646; Wheeler v. Baker, (Neb.) 71 N. W. 750; Prosser v. Chapman, 29 Conn. 515; Love v. Johnson, 34 N. C. 367; Jordan v. Wickham, 21 Mo. App. 536; Ry. Co. v. Murray, 87 Fed. 647; Davis v. Lumber Co., 14 Wyo. 517; Johnston v. Irrigation Co., 4 Wyo. 164; Perkins v. McDowell, 3 Wyo. 328.) If the plaintiff might have amended its petition, if amendment was necessary, so as to support the judgment, the defendant could not have been prejudiced by the over-

ruling of the demurrer, even though such amendment was not filed. (Ry. Co. v. Pollock, 16 Wyo. 321; Kuhn v. McKay, 7 Wyo. 42.)

There was no proper exception to the decision upon the demurrer; the entry showing the ruling not containing the grounds of the objection, and there being no bill of exceptions. (Comp. Stat. 1910, Secs. 4594, 4595, 4597-9, 5107, 5109; Burns v. Ry. Co., 14 Wyo. 498.)

The validity of a water right cannot be questioned in an action to condemn a right of way for the ditch. (Schneider v. Schneider (Colo.), 86 Pac. 347; Denver P. & I. Co. v. Ry. Co. (Colo.), 69 Pac. 568.) A lawful appropriation of water is not under the law of this state a condition precedent to acquiring a right of way for a ditch by purchase nor to the right to construct a ditch. Hence, if the defendant by its conduct in this case has acquiesced in the condemnation proceedings by stipulating that the question of damages which it would sustain by reason of the taking should be submitted to the court for adjudication, it could not repudiate its own act. The allegations of the petition upon which the final judgment was rendered alleges the facts as to the applications filed in the engineer's office and the official action taken thereon, and that a right to construct the ditch and divert water was acquired. Whether such right was acquired was a question of fact in the case, and that question was finally decided against the defendant by the lower court upon the evidence submitted, and as the evidence is not before this court, the decision of the trial court upon the question is not here for consideration. The pleadings show the necessary affirmative action by the state engineer upon the application of the plaintiff, defendant in error here, and is thus sufficient to sustain the judgment. The acts of public officers are presumed to be legal and regular until the contrary affirmatively appears. (Cicero v. Ry. Co. (Ind.), 97 N. E. 389.) The case cited by opposing counsel (Castle Rock &c. Co. v. Jurisch, 93 N. W. 690) is not in point, for the reason that in that case the petitioner in the condemna-

tion proceeding had been refused a permit to appropriate water for its proposed ditch. The state is the only party competent to question the acts of the engineer in the exercise of the power granted him by the constitution and statutes to supervise the waters of the state and their distribution. (Water Works v. Peralta (Cal.), 45 Pac. 169; Quigley v. Birdseye (Mont.), 28 Pac. 741.) The state engineer has the power to approve an application for and thereby to permit the diversion of water in this state for the purpose of irrigating lands lying wholly within a neighboring state. (Willey v. Decker, 11 Wyo. 496; Bean v. Morris, 221 U. S. 485; Atchison v. Peterson, 20 Wall. 507; Basey v. Gallagher, id. 681; Kansas v. Colo., 206 U. S. 46; Rickey L. & C. Co. v. Miller, 218 U. S. 258; Morris v. Bean, 146 Fed. 423; Bean v. Morris, 159 Fed. 651; Hoge v. Eaton, 135 Fed. 411; Anderson v. Bassman, 140 Fed. 14; Howell v. Johnson, 89 Fed. 556; Const., Art. I, Sec. 31; Art. VIII, Secs. 1, 2, 3, 5; Farm Inv. Co. v. Carpenter, 9 Wyo. 110; Cline v. Stock (Neb.), 98 N. W. 454; Brown v. Cunningham, 82 Ia. 512, 48 N. W. 1042; Rosmiller v. State, 89 N. W. 839; Perkins Co. v. Graft, 114 Fed. 441.) From a review of the authorities cited it is apparent that where, as appears in this case, the legitimate demands of this state as to the waters of Crow Creek having been satisfied, the State of Colorado and this plaintiff have the right to insist upon the natural flow of the surplus waters of the stream into Colorado. Plaintiff's diversion being at a point below any possible subsequent diversion for useful purposes within this state, and the plaintiff having lawfully appropriated and acquired the right to divert such waters at a point just over the line in the other state, its taking of the water in this state as desired is merely taking that which already belongs to it by virtue of its appropriation under the laws of Colorado. In permitting such appropriation and diversion in this state the engineer guarded every interest, and followed the spirit and plain intent of the constitution.

Upon the facts alleged in the petition this state was required to permit the waters of the stream in question to flow in their natural channel, without further diminution, into the State of Colorado. (Coffman v. Robbins, 8 Or. 278.) One who is entitled to a given quantity of the water of a stream may take the same at any point on that stream, and may change the point of diversion at pleasure, if the rights of others be not injuriously affected thereby. (Hobart v. Wicks, 15 Nev. 418; Kidd v. Laird, 15 Cal. 162; Davis v. Gale, 32 Cal. 26; Junkans v. Bergin, 67 Cal. 267; Ramelle v. Irish, 96 Cal. 214; Coffin v. Ditch Co., 6 Colo. 444; Sieber v. Frink, 7 Colo. 148; Strickler v. Colo. Springs, 16 Colo. 62; Woolman v. Garringer, 1 Mont. 535; Kinney on Irr., Secs. 233, 248; Black's Pom. on Water Rights, Sec. 69; Gould on Waters, Sec. 237; Anderson v. Bassman, 140 Fed. 21.)

If the contention that this plaintiff in its petition has shown a right to divert the water in this state is correct, then it must follow that it has the right to condemn land for a right of way for its ditch. The constitution and the statute give it that right. (Const., Art. 1, Secs. 32, 33; Comp. Stat. 1910, Sec. 3874.) An irrigation ditch serves a public purpose, and although it is constructed for a private use the right to condemn a right of way therefor is given by the constitution. The Legislature may vest the power of eminent domain in a company, whose purpose it is to irrigate lands in a neighboring state. The language of the statute above cited is general and does not withhold the power of condemnation from this plaintiff. The requirements as to public use are met when the taking will tend to enlarge the resources, increase the industrial energies, and promote the productive powers of any considerable part of the state. As found by the trial court, the reclamation of the land in question in the adjoining state just beyond the boundary line of this state will be of material and substantial benefit to a considerable part of the individuals of a section of this state, and "indirectly contribute to the pros-

perity of the whole community." The *obiter dictum* found in the Alabama case of Water Works Co. v. Long, 25 So. 702, is cited as the sole authority for the text in Lewis on Eminent Domain, and is neither controlling nor applicable here, for the reason that with reference to an irrigation ditch it is the public benefit, irrespective of the character of the use, which furnishes the foundation for the right of eminent domain. The right claimed in this case is supported by the authorities cited as to the right to appropriate water for use in another state, and particularly by the case of In re. Townsend, 39 N. Y. 175, which involved the right of a canal company to condemn lands in New York which would be flooded by the construction of a reservoir for supplying water to the canal of the petitioner in the State of New Jersey. (See also Gilmer v. Lime Point, 18 Cal. 229.)

*Clark & Clark*, for plaintiff in error, in reply.

In this state no appeal can be prosecuted until after final judgment, but a defendant whose demurrer is overruled may either stand thereon and submit to judgment and then appeal from the judgment, or may save his exception to the order overruling the demurrer, answer over, go to trial, and then appeal from an unfavorable judgment, and thereby secure a review of the order overruling the demurrer. (Perkins v. McDowell, 3 Wyo. 328; Dobson v. Owens, 5 Wyo. 85; Mo. Pac. Ry. Co. v. Webster, 3 Kan. App. 106, 42 Pac. 845.) No bill of exceptions is necessary to present for review a ruling upon a demurrer to a pleading. (Perkins v. McDowell, *supra;* Dobson v. Owens, *supra.*) The entry in which the ruling upon the demurrer appears states the exception of the defendant thereto. It was unnecessary for the entry to state any further grounds of objection in the entry. There can be no question as to the power of this state to prohibit, limit or condition the right of any person to divert public waters within the state. (Kirk v. Board (Neb.), 134 N. W. 167.) When the plaintiff comes into this state to make its diversion it subjects itself to all the statutory limitations imposed by this state. An examination

of the petition as finally amended will show that the various applications and official indorsements with reference to the right to construct the ditch and appropriate the water in this state are set out in full, for the very purpose of raising the legal question as to whether the action of the engineer constituted an approval, and the answer put in issue that question. The general grant by statute of the power of eminent domain to all corporations of a certain class or organized for certain purposes does not include foreign corporations. (Lewis on Em. Dom., Sec. 374; Pyrites Co. v. Mining Co., 119 Ga. 354, 100 Am. St. Rep. 174; Helena &c. Co. v. Spratt, 35 Mont. 108, 88 Pac. 772; Postal Tel. C. Co. v. Railroad, 94 Fed. 234.) Although a foreign corporation may be authorized to do business in this state, the courts will not permit it to exercise the power of eminent domain unless the Legislature has clearly and expressly granted that right to such a corporation.

POTTER, JUSTICE.

The Lovella Ditch, Reservoir and Irrigation Company, a corporation organized under the laws of the State of Colorado, brought this proceeding in the District Court in Laramie County by filing a petition with the clerk of that court to condemn certain land situated in this state owned by the Grover Irrigation and Land Company, a corporation also organized under the laws of Colorado, for the purpose of locating and maintaining thereon the headgate and part of the ditch of an irrigation system being constructed or about to be constructed by the plaintiff to divert water from Crow Creek and thereby reclaim 10,000 acres of land situated in Weld County, in the State of Colorado. It is alleged and the fact is not disputed that Crow Creek is a natural stream flowing through the land of defendant and into and through the northern part of Colorado. That stream has its source in this state, and the land of defendant is located on or near the southern boundary line of the state in township 12, range 62. The location of the proposed headgate and point of diversion for the ditch in question is upon the east bank

of the stream in this state about 700 feet from the boundary line between this state and the State of Colorado.

An amended petition was filed as a substitute for and taking the place of the original petition. The defendant filed a demurrer to the amended petition stating the following grounds: (1) That said petition does not state facts sufficient to constitute a cause of action; (2) that it is insufficient in law, on its face, to authorize the appropriation of the land of the defendant as prayed for; (3) that it shows that the plaintiff is not entitled to appropriate the land of the defendant as prayed. The demurrer was overruled, and to that ruling the defendant excepted. Thereafter the defendant filed an answer putting in issue the necessity for taking the land described or locating the headgate in this state, and also the right of the plaintiff to locate the headgate, or construct the same or the ditch, or divert and appropriate the water of said stream in this state as proposed. A reply was filed denying some of the allegations of the answer which relate to matters not necessary to be considered.

Before the matter was submitted to the District Court for final determination an application made by the plaintiff for an order authorizing it to take immediate possession of the land upon executing a good and sufficient bond with sureties to be approved as provided by law was heard and granted, to which the defendant objected and excepted. It appears that upon the hearing of that application evidence was introduced by both parties, and the cause was finally submitted upon that evidence and the pleadings and record. The court found specifically, among other things, that the plaintiff has a right to divert the water of the stream aforesaid within this state for the purpose of irrigating about 10,000 acres of land situated in the northern part of the State of Colorado; and that in the construction of plaintiff's said irrigation system and its headgate it is necessary for it to have, own and control the said land of the defendant, the same being described by metes and bounds. And it was thereupon

ordered, adjudged and decreed that the plaintiff "be and is hereby authorized to permanently appropriate" the said land "for the purpose of constructing its said irrigation system," and commissioners were appointed to determine the compensation to be paid for the taking or injuriously affecting such lands. The facts found, the conclusions, and the order, including the appointment of commissioners, are all embraced in the same entry, and at the end thereof appears the following: "to all of which the defendant, The Grover Irrigation and Land Company, at the time duly excepted and excepts." The commissioners so appointed subsequently filed their report showing that they had met, qualified and organized as required by law, and certifying the amount of land necessary to be taken and the damages accruing to the owner thereof. It was stated in said report that the commissioners had appointed a time and place for hearing, notified the parties thereof, and met at the time so appointed, that the said defendant did not appear, and that after viewing the premises and hearing the proofs offered by the plaintiff, the damages to be paid to the defendant had been assessed in the sum of $84. The defendant, as permitted by statute, filed a written exception to the report of the commissioners, thereby excepting to said report on the ground "that the plaintiff herein has shown no right to appropriate for the uses and purposes set forth in the amended petition herein any of the land owned by this defendant as prayed in said petition." Upon the exceptions so filed the report was reviewed by the court, no demand being made by either party for a jury trial, and the same was confirmed, and it was ordered that the title to the land in question be confirmed in the plaintiff, it being recited in the order that the amount of the compensation assessed by the commissioners had been paid to the clerk of the court for the use and benefit of the defendant. To all of that order also, as recited therein, the defendant duly excepted.

A petition in error has been filed in this court by said defendant for the review of the proceedings, assigning as error

the overruling of the demurrer to the amended and substituted petition, the overruling of the exceptions to the report of the commissioners, and the making and entering of the several orders and judgment above referred to, complaining of the judgment and each of said orders on the ground that the same is contrary to law. A motion to dismiss was filed by counsel for defendant in error, and the cause was argued and submitted upon such motion and also upon the merits without a waiver of the motion.

1. The motion to dismiss is based upon these facts: That there is no bill of exceptions in the record, that after the demurrer was overruled the defendant filed an answer and permitted a hearing upon the merits, and has brought this proceeding for a review of the final judgment. It is contended in support of the motion that without a bill of exceptions the exception to the ruling upon the demurrer is not properly preserved and cannot, therefore, be considered, and, further, that by filing the answer and permitting a trial upon the merits the demurrer was waived and also the error, if any, in overruling it. And it seems to be assumed in so contending that by waiving the demurrer the objections therein stated would also be waived. In view of the character of the objections urged against the amended petition as ground for reversal, it may not be very important in this case whether the plaintiff in error is in a position permitting it to assign as error the order overruling the demurrer. But it is not improper to consider and decide that question, and, since counsel for defendant in error have earnestly contended for a rule as to the necessity of a bill of exceptions to present for review on error a ruling upon a demurrer to a pleading in conflict with the previous decisions and the uniform and hitherto unquestioned practice in this court, we think it advisable, particularly as to that question, that the law upon the subject as we understand it should be again stated, and the reasons therefor more fully explained, especially with reference to certain statutory provisions relating to exceptions relied on by counsel in support of the

motion. Properly construed and understood, there should be no confusion in applying those provisions.

Originally, at common law only the errors apparent on the face of the record proper were reviewable on a writ of error, that record consisting of the pleadings, process, verdict, and judgment. To remedy that condition of the law a statute was enacted permitting a bill of exceptions. A bill under that statute was described as founded on some objection in point of law to the opinion and direction of the court, upon a trial at bar, or of the judge at *nisi prius,* either as to the competency of witnesses, the admissibility of evidence or the legal effect of it, or for overruling a challenge, or refusing a demurrer to evidence, or some matter of law arising upon facts not denied, in which either party is overruled by the court. (2 Tidd's Pr. 862; Wheeler v. Winn, 53 Pa. St. 122, 91 Am. Dec. 186.) It was always held that the statute contemplated a bill for the purpose and as the only means of bringing upon the record objections or points of law ruled upon by the inferior court, and that it did not affect or apply to any matter that would be shown by the record proper, since the only reason for allowing or providing for a bill of exceptions was that the ruling excepted to could not otherwise appear upon the record. Referring to the English statute, Judge Tilghman, in Downing v. Baldwin, 1 S. & R. 300, said: "The statute does not say that a writ of error shall lie on the bill of exceptions. But, inasmuch as a writ of error lies at common law, and the effect of it is to bring the record before the superior court, the judges, finding the bill of exceptions upon the record, are bound to take notice of it." In Wheeler v. Winn, *supra,* after quoting and referring to the remarks of Judge Tilghman, and speaking of a state statute which required, when requested by counsel, that the opinion of the court with the reasons therefor be reduced to writing and filed "of record in the cause," the court said: "The judges, on return of a writ of error, finding upon the record palpable errors in a charge written and filed under the statute, are equally bound

to take notice of them as if they were contained in a bill of exceptions." Since the Appellate Court must necessarily take notice of the record, and certain papers and proceedings in a cause either by the common law or statute constitute the record without a bill of exceptions, including by statute in this state the pleadings, as well as the judgment and orders proper to be entered upon the journal of the court, and the sole purpose of a bill of exceptions is to bring upon the record and before the court facts and proceedings which otherwise would not appear of record, a bill is unnecessary where all the facts and proceedings upon which error is alleged are shown by the record proper, and that is the firmly established rule. (3 Ency. Pl. & Pr. 404-406; 2 Cyc. 1076; 4 Standard Proc. 293, 298.) In line with the general ruling upon the subject this court has held that it is unnecessary and improper to incorporate the pleadings and journal entries in a bill, although when that is done it will not invalidate the bill or prevent that properly within it from becoming part of the record. (Sawin v. Pease, 6 Wyo. 91, 42 Pac. 750; see also 3 Ency. Pl. & Pr. 404-406.) With these principles in mind there cannot be much difficulty, we think, in construing the statutory provisions on the subject, notwithstanding that they may seem to contain some confusing expressions. The provisions are found in Sections 4597 and 4598, Compiled Statutes, 1910, the latter prescribing when it is, and the former when it is not, necessary to reduce exceptions to writing and have them allowed and signed by the court or judge. We quote all of Sec. 4597 and the material part of Section 4598.

"Sec. 4597. When the decision objected to is entered on the record, and the grounds of objection appear in the entry, the exception may be taken by the party causing it to be noted at the end of the entry that he excepts."

"Sec. 4598. When the decision is not entered on the record, or the grounds of objection do not sufficiently appear in the entry * * * the party excepting must reduce his

exception to writing and present it to the court, or to the judge * * * within the time given for allowance."

· Following the generally accepted rule above stated, it has been the practice in this court from the beginning when considering an error alleged in the sustaining or overruling of a demurrer to a pleading to do so upon the record proper, without requiring the ruling and exception to be shown by a bill of exceptions. A few cases only will be cited. In some, perhaps a majority of those cited, the fact that the hearing was had upon the record without a bill is not stated, but it appears inferentially at least in most of them, and in none does it appear that the exception was preserved by bill, or that a 'bill was deemed necessary for that purpose. (U. P. R. R. Co. v. Byrne, 2 Wyo. 109; Commissioners v. Johnson, 2 Wyo. 259; Perkins v. McDowell, 3 Wyo. 328, 23 Pac. 71; Wheaton v. Rampacker, 3 Wyo. 441, 26 Pac. 912; France v. Connor, 3 Wyo. 445, 27 Pac. 569; Cone v. Ivinson, 4 Wyo. 203, 212, 33 Pac. 31, 35 Pac. 933; State v. Commissioners, 4 Wyo. 313, 33 Pac. 992, 35 Pac. 929; Commissioners v. Atkinson, 4 Wyo. 334, 340, 33 Pac. 995; Dobson v. Owens, 5 Wyo. 85, 37 Pac. 471.) It was held in Railroad Co. v. Byrne, *supra*, and in Dobson v. Owens, *supra*, that a bill was not necessary to present the exceptions. In the first of these cases Judge Peck said: "This is an action of assumpsit for merchandise sold and delivered by Byrne to the Company. The latter duly excepted, and duly presents to us under Section 302 of the Civil Code, an exception to an order of the District Court, overruling its demurrer to the petition; but the exception has no merit." The section referred to, found on page 71 of the Compiled Laws, 1876, is now Section 4597 above quoted. The opinion clearly discloses that the demurrer and exception thereto were not shown by bill of exceptions. That it was intended by the learned judge to construe the section in accordance with the general rules above stated as to the purpose and necessity of a bill fairly appears from his dissenting opinion in Johns v. Adams Bros., 2 Wyo., at page 203. He there

said: "The record defined by Section 387, (the section stating from what the record shall be made up, now Section 4630 Comp. Stat.) embraces exceptions that are preserved under 302 and 303 (now Sections 4597 and 4598, Comp. Stat.) These two sections intended only to put the record of the District Court, in respect to exception, into condition for review here; but are wholly distinct from, and independent of each other—each applying to a class of cases essentially different from that to which the other applies; and, when either has been complied with, and the other appellate provisions have been observed, the exception secures to the party the right to a review here of whatever the exception presents. The first (302) provides for only exceptions which relate to matters originating in—have their basis in the record—and are perfected, by being in the first instance entered there; the second (303) for only exceptions which relate to matters not originating in—have their basis not of the record—and are perfected upon, and become a part of it only through a bill of exceptions." In Dobson v. Owens, Chief Justice Groesbeck, delivering the opinion, it was held that although the bill of exceptions was defective and, therefore, could not be considered, the ruling upon the demurrer to the answer which was excepted to was open to consideration, since the transcript of the record outside the bill showed such ruling and exception, and the ruling was assigned as error, the court saying: "This is sufficient to confer jurisdiction upon this court, without regard to the matters presented in the bill of exceptions." And a motion to dismiss on the ground that the bill of exceptions was defective was denied. In Perkins v. McDowell, it appears that an order overruling a demurrer to the petition was reviewed upon the record proper, Chief Justice Van Devanter delivering the opinion.

Counsel for defendant in error cite the case of Johnson v. Irrigating Co., 4 Wyo. 164, 33 Pac. 22, as authority for the proposition that a bill is required to preserve and present an exception to the ruling upon a demurrer. But the

point was not involved in that case.  It was a proceeding conducted under a statute for an adjudication of priorities of water rights, and came to the District Court on appeal from the State Board of Control.  Motions to dismiss the appeal were sustained on the ground of the insufficiency of the notice of appeal, and a motion for leave to file an amended notice was overruled.  The cause came to this court on error without any bill of exceptions, and it was held that no question was presented for review, in the absence of a bill showing the exceptions to the ruling on the motions and the facts explaining the same; and a reference to the argument of counsel published in the report of the case shows that the point made in that respect was that the motions aforesaid were not part of the record without a bill.  That we think was the point decided with reference to the necessity of a bill.  The case does not hold that a matter otherwise of record must also be presented by a bill of exceptions.  Other cases decided by this court might be cited which hold that a bill is not required as to matters fully shown by the record proper, but those above cited are sufficient to show that the question has for many years been definitely and conclusively settled by this court, and we think without doubt that it has been correctly settled.

It is provided in Section 4598 that when the bill has been allowed and signed it shall be filed *with the pleadings as a part of the record,* thus recognizing the purpose of the bill to bring something into the record, and that the pleadings constitute a part of the record.  A demurrer is a pleading under the code.  (Comp. Stat. 1910, Sec. 4378.)  If there is any expression in either section at all confusing it is that which refers to the grounds of objection appearing or not appearing in the entry.  But when the object of a bill is considered, it is clear that in connection with the demurrer already a part of the record, the grounds of objection sufficiently appear in an entry showing a ruling upon the demurrer, either sustaining or overruling it.  The purpose, and the only purpose, of the provisions of the two sections

is to have a record showing and explaining the exception.
The cases from Ohio, from which state our code was taken,
so far as they touch upon the matter, show that the rule
there observed is that a bill is required only in respect of
matters not shown by the record proper.   (Goyert v. Eicher,
70 O. St. 30, 34, 70 N. E. 508;  Howell v. Fry, 19 O. St.
556;  Harner v. Batdorf, 35 O. St. 113;  Lockhart v. Brown,
31 O. St. 431.)   And in Commercial Bank v. Buckingham,
12 O. St. 402, referring to the provisions covering the matter
of exceptions, it is said that these provisions are found in
the title which treats of and regulates the trial of causes,
"and they manifestly relate to decisions which are made by
the court, upon questions of law which arise during the
progress of the trial."   And it was held that they did not
relate to the final judgment, the court saying further:   "If
the record shows such final judgment to be erroneous, it
is the right of the party aggrieved to have it reversed, va-
cated, or modified, on petition in error, to the proper review-
ing court.   To note an exception to a final judgment, in the
court which renders it, after the controversy is there ended,
would seem to be utterly futile."   That decision was cited
and followed by this court in Nichols v. Com'rs., 13 Wyo.
1, 76 Pac. 681, 3 Ann. Cas. 543, as to the necessity for noting
an exception to the final judgment.

In Indiana the code provisions respecting this matter are
expressed in the same language as that found in our statute,
and they have been construed by the Supreme Court of that
state as to their effect upon an exception to a ruling upon a
demurrer.   Referring to the provision that where the de-
cision objected to is entered on the record, and the grounds
of objection appear in the entry, the party may cause it to
be noted at the end of the entry, that he excepts, and that
such entry shall be sufficient, it is said in Matlock v. Todd,
19 Ind. 130:   "Now pleadings must be entered of record.
The complaint, answers, demurrers, etc., must be filed by the
clerk, and they constitute a part of the record proper.   The
journal entry, by the clerk, of their filing, is, also, necessarily

a part of the record. And where a demurrer is. filed to a pleading, the demurrer, as we have said, is a natural part of the record; the entry, by the clerk, of its filing, is so also; and so is the action of the court in sustaining or overruling it. And as the demurrer must assign causes, the ground of the decision of the court upon it appears necessarily, as a general rule, in such cases, in the entry of the decision by the clerk, considered in connection with the demurrer. Hence, a bill of exceptions, in such cases, is not necessary. It is only necessary that the party cause it to be noted that he excepts." The same principle is announced and applied in Lucas v. Waynetown, 86 Ind. 180; Redinbo v. Fretz, 99 Ind. 458, and Lindley v. Kelley, 42 Ind. 294. In the case last cited, after quoting the two sections like our own under consideration, the court say: "The above quoted sections do not introduce any new practice, but simply re-enact the law as it has existed since bills of exception were introduced by statute in England." (See also Elliott's App. Proc. Secs. 783, 797; Phillips on Code Pl., Sec. 528.) In Kansas under a statutory provision like our own, as to an exception where the grounds of objection appear in the entry, it was uniformly held that a bill of exceptions was necessary only to make a record of what would not otherwise appear in the record . In Burns v. Burgett, 19 Kan. 162, it was said that a bill should be confined to its legitimate purpose of only stating matters which would otherwise not be incorporated in the record. And in that state it was also held that neither a bill of exceptions nor an exception is necessary to present for review an error apparent upon the record. (Est. of Shaffer v. McKanna, 24 Kan. 22; Wooley v. Van Volkenburgh, 16 Kan. 20; McKinstry v. Carter, 48 Kan. 428, 29 Pac. 597; Nute v. Am. Glucose Co., 55 Kan. 225, 40 Pac. 279; Burdick on New Tr. & App., Secs. 191-193.) A bill of exceptions, if prepared to show an exception to a ruling upon a demurrer to a petition would necessarily and only recite the filing of the petition and demurrer, setting them out in full, the ruling upon the demurrer and the exception.

All that appears by the record proper. None of that requires the additional authentication of the certificate and signature of the judge. To require a bill in such case would be worse than useless. The record entry of the decision and exception necessarily shows that the demurrer was sustained or overruled. The exception, if one is noted, is to that decision; the demurrer constitutes the objection. And where the entry states that the ruling was upon the demurrer, a paper which is of record in the cause, the grounds of the objection sufficiently appear in the entry, and with the same force and effect as a record as though the cause or the several causes assigned for the demurrer were copied at length in the journal entry recording the decision. But in the case at bar the entry is not confined to a statement of the decision, as it might have been, but preceding the order overruling the demurrer it recites that the court finds that the petition states a cause of action, clearly indicating thereby the ground of the objection urged against the petition. In accordance with the previous decisions of this court, therefore, we hold that the exception to the ruling upon the demurrer sufficiently appears upon the record, if under the circumstances of the case, that ruling may properly be considered in reviewing the final judgment.

2. A waiver of the demurrer would not be ground for dismissal without also a waiver of the defects suggested by the demurrer. The grounds of objection stated in the demurrer and here urged do not relate to the form of the statement of the cause of action, but the effect thereof is to charge a total failure to state the substance of a good cause of action, and that the petition is therefore insufficient to support the judgment. Such a defect is never waived either by failure to demur or by answering over after demurrer filed and overruled, unless the defect be aided or cured by the answer or the subsequent proceedings.

At common law, after the enactment of the statutes of amendments and *jeofails,* a general demurrer was limited to defects in substance, and by pleading over, without de-

murring specially, defects of form were waived or cured. Defects of substance, which might be taken advantage of by general demurrer, such as want of jurisdiction of the subject matter, or the failure to allege sufficient facts, the defect not being merely in the form of the statement, were not waived or cured by pleading over without demurring. On the contrary such defects could be taken advantage of at any subsequent stage of the proceedings, as by objecting to the introduction of evidence, by motion in arrest of judgment, by motion for judgment *non obstante veredicto,* or by writ of error. There were certain exceptions to this rule. A defect in a pleading even as to matter of substance might be aided or cured by the pleading of the adverse party, as where the answer supplied a necessary fact omitted from the declaration. And the defect might be aided or cured by the verdict, that is to say, by intendment after verdict, the doctrine in that respect being that where a defect in a pleading would have been a fatal objection upon demurrer, yet if the issue joined be such as necessarily required, on the trial, proof of the facts defectively or imperfectly stated or omitted, and without which it is not to be presumed that either the judge would direct the jury to give, or the jury would have given, the verdict, such defect, imperfection or omission is cured by the verdict; but the thing presumed to have been proved must be such as can be implied from the allegations, by fair and reasonable intendment. (1 Chitty's Pl., 16th Am. Ed., 705.) The main rule on the subject is, as said by Chitty, that a verdict will aid a defective statement of title, but will never assist a statement of a defective title, or cause of action. (Id. 713.) The courts will never, in order to support a verdict, made an intendment which is *inconsistent* with the allegations on the record. (Id. 712; Stephen's Pl., 3rd Am. Ed., 164; Andrews' Stephen's Pl., 2nd Ed., Sec. 142.)

The reason for the rule that a defect in substance is not waived except under the conditions stated is, that a pleading of fact, such as an answer, does not admit the sufficiency in

law of the facts adversely alleged in a prior pleading. If a pleading does not state a cause of action or a defense, there is none to be maintained by the proof. It follows, therefore, as said in Phillips on Code Pleading, "that where a pleading is insufficient in substance, the opposite party may, without demurring, generally avail himself of such insufficiency. He may do this in various ways, such as by objecting to the introduction of evidence at the trial, by motion in arrest of judgment, by motion for judgment *non obstante veredicto*, or by writ of error." (Sec. 304.) Some defects of form which at common law are grounds for special demurrer are objected to under the code practice only by motion. The various grounds of demurrer stated in the code include want of jurisdiction of the subject of the action, and that the petition does not state facts sufficient to constitute a cause of action. (Comp. Stat., Sec. 4381.) And the demurrer is required to specify the grounds of objection, although it is declared that if the grounds are not specified, it shall be regarded as objecting only that the petition does not state facts sufficient to constitute a cause of action, or that the court has no jurisdiction of the subject matter. (Id., Sec. 4382.) Since these two defects are those reached by general demurrer at common law, a demurrer specifying those grounds is usually referred to as a general demurrer, though that term is not employed in the code. It is further provided in the code as to these two substantial defects as follows: "When any of the defects enumerated in Section 4381 do not appear upon the face of the petition, the objection may be taken by answer, and if no objection be taken either by demurrer or answer, the defendant shall be deemed to have waived the same, except only the objection to the jurisdiction of the court, and that the petition does not state facts sufficient to constitute a cause of action." (Sec. 4383.) And by Section 4624 it is provided: "When, upon the statements in the pleadings, one party is entitled by law to judgment in his favor, judgment shall be so rendered by the court, although a verdict

has been found against such party." This provision, it is said by the Supreme Court of Ohio, carries into the code the substance of what was theretofore known as a motion *non obstante veredicto* and a motion in arrest of judgment. (McCoy v. Jones, 61 O. St. 119, 55 N. E. 219.)

The code, therefore, follows the rule at common law, that a defect in substance is not waived by failure to demur, and that is the rule generally prevailing under code practice. In accordance with this is the further rule prevailing in most jurisdictions, that for such a defect in substance the objection may be made for the first time on appeal, the rule excluding, of course, objections relating merely to the form or manner in which the cause of action is stated, and requiring that the pleading be construed liberally and supported by every legal intendment, and therefore upheld if the necessary facts are fairly to be inferred from the allegations. (2 Ency. Pl. & Pr. 541-542, 365-366, 373; 2 Cyc. 691; 2 Standard Proc. 250; Phillips on Code Pl., Sec. 304; Elliott's App. Proc. 471; Chicago v. Lonergan, 196 Ill. 518, 63 N. E. 1018; Kellogg v. School Dist., 13 Okla. 285, 74 Pac. 111; Trimble v. Doty, 16 O. St. 119; Dalles L. Co. v. Urquhart, 16 Or. 71, 19 Pac. 78; Hartford Fire Ins. Co. v. Kahn, 4 Wyo. 364, 34 Pac. 895; Nichols v. Com'rs., 13 Wyo. 1, 76 Pac. 681, 3 Ann. Cas. 543.) In the last case cited, it was said by this court to be the established rule that a judgment obtained on a petition which fails to state a cause of action will be reversed, though no objection was made thereto in the lower court. Dalles L. Co. v. Urquhart, *supra,* was like this case in this, that the question was whether on the pleadings condemnation was authorized.

The principles above stated apply as well where a demurrer has been filed and overruled, for nothing can be clearer than that a party cannot by demurring lose the right which is his without demurring. As said in Colorado, "Having demurred (although no exception was taken to the ruling), appellant is not in any worse position than if no demurrer had been filed." (Board &c. v. Leonard, 26 Colo.

145, 57 Pac. 693.) This is, indeed, clearly implied by the provisions of Section 4383, *supra,* for it could not be intended that a defect not waived by failing to take the objection by demurrer or answer would be waived when the objection is so taken. If the demurrer remains on the record for consideration on appeal, together with the exception to the ruling thereon, then surely the objection is not waived by demurring, and if the demurrer is waived by pleading over after it is overruled, then it goes out of the record and cannot be considered for any purpose, for the theory upon which the courts adopting the rule hold that a demurrer when overruled is waived by pleading over is, that either expressly or impliedly the demurrer is withdrawn or abandoned by filing the subsequent pleading of fact, and when so withdrawn or abandoned the case stands as though no demurrer had been filed. Formerly, at common law, when a demurrer to the declaration was overruled, the facts were deemed to be established as alleged, and judgment was entered thereon, as is now done when a defendant stands on his demurrer, refusing to further plead. When the practice was adopted of allowing the defendant to plead after the demurrer was overruled, he was required to withdraw his demurrer, and thereafter the case was treated the same as if there had been no demurrer. It passed out of the record and judgment thereon was avoided. By the modern practice, where the rule prevails that by pleading over after the overruling of a demurrer the latter is waived, it is not usual to require a formal withdrawal of the demurrer, but it is so treated and ceases to be considered as on the record, and the parties are left in that respect in the same situation as if the demurrer had not been filed. (Phillips on Code Pl., Sec. 307; Bliss on Code Pl., Sec. 417; Nordhaus v. R. R. Co., 242 Ill. 166, 89 N. E. 974; Wales v. Lyon, 2 Mich. 276.) Therefore, for clear and obvious reasons, whether the position be taken that the ruling on the demurrer is open to consideration when reviewing the final judgment, or that it is not, in either case the objection is not waived

by filing a demurrer that has been overruled, where it would
not be waived by failing to demur.  This is recognized by
all the authorities, as will be disclosed by reference to the
cases decided in those states where the demurrer and the
specific error, if any, in overruling it is held to be waived
by pleading over, as well as where the contrary is the ac-
cepted rule.  (Wheelock v. Lee, 74 N. Y. 495; Sullen-
berger v. Gest, 11 Ohio, 205; City of Plankinton v. Gray,
63 Fed. 415, 11 C. C. A. 268; Marske v. Willard, 169 Ill.
276, 48 N. E. 290; Chicago v. Lonergan, *supra;* Catron v.
La Fayette Co., 106 Mo., 659, 17 S. W. 577; Haase v.
Distilling Co., 64 Mo. App. 131; Wilson v. Ry. Co., 67
Mo. App. 445; Goodrich v. Com'rs., 47 Kan. 355, 27 Pac.
1006, 18 L. R. A. 113; Sanford v. Weeks, 39 Kan. 649,
18 Pac. 823; Fordyce v. Merrill, 49 Ark. 277, 5 S. W. 329;
White v. Stokes, 67 Ark. 184, 53 S. W. 1060; Cox v. Peoria
Mfg. Co., 42 Neb. 660, 60 N. W. 933; Hopewell v. Mc-
Grew, 50 Neb. 789, 70 N. W. 397; Bank v. Pence, 59 Neb.
579, 81 N. W. 623.)

It follows that it would be necessary to deny the motion
to dismiss, whether the ruling on the demurrer may properly
be considered or not, for upon the record, without regard
to the demurrer, but treating it as never filed or withdrawn,
the question is presented by the petition in error whether the
petition upon which the judgment was rendered states facts
sufficient to constitute a cause of action or to support the
judgment.  A consideration of the ruling on the demurrer
as an alleged ground for reversal would not change the situ-
ation, or the rules to be applied in reviewing the judgment,
for any error or defect in the pleadings or proceedings not
affecting the substantial rights of the adverse party must be
disregarded; and the defendant having answered and gone
to trial upon the issues of fact, the plaintiff would be en-
titled at this stage of the case to the benefit of anything in
the proceedings subsequent to the overruling of the demurrer
that may have aided the defect in the petition, if any, under
the rules above adverted to.  (Davis v. Lumber Co., 14 Wyo.

517, 85 Pac. 980; Nott v. Johnson, 7 O. St. 270.)   In this case there is nothing in the intermediate proceedings that can aid the petition, if the objections are well taken.   Aside from the mere technicality involved in the question, therefore, it is immaterial whether the assignment of error based upon the overruling of the demurrer be considered, or the other assignments under which it is also claimed that the judgment is erroneous because unsupported by any facts alleged in the petition.   And that, we think, might be a sufficient reason for disregarding the strict and technical rule at common law that the effect of answering over is to abandon or withdraw the demurrer, at least where there is no right of appeal directly from the order overruling the demurrer, but only from a final judgment rendered thereon, or from the final judgment rendered in the cause.   But the practice has been long established in this court of considering an exception to the order overruling a general demurrer, when reviewing a judgment rendered upon a trial involving issues of fact presented by subsequent pleadings.   This is shown by many cases, some of them being cited in that part of this opinion discussing the matter of exceptions, and among others that might be cited are the early cases of Insurance Company v. Pierce, 1 Wyo. 45, and Ivinson v. Althorp, 1 Wyo. 71; and the later case of Davis v. Lumber Co., 14 Wyo., 517, 85 Pac. 980.   We should hesitate in refusing to follow a practice so long established without the most urgent reasons for doing so.   But we are convinced that it accords with the intent and spirit of the code and is sustained by its provisions.   As frequently decided by this court an appellate proceeding cannot be taken from the order overruling the demurrer, but only from a final judgment rendered thereon when the party stands on his demurrer without pleading further, or from a final judgment rendered in the cause after a trial of the issues of fact where there has been further pleading presenting issues of fact.

Where the order overruling a demurrer is treated as interlocutory merely and not, therefore, an order authorizing the

immediate taking of an appeal or proceeding in error, and the objection is either that the pleading, if a complaint or petition, fails to state facts sufficient to constitute a cause of action, or that there is a want of jurisdiction of the subject matter, the general rule that error in overruling a demurrer is waived by pleading over does not apply. (6 Ency. Pl. & Pr. 365; 1 Bates Pl. Pr. Par. & F. 423-424; Teal v. Walker, 11 U. S. 242, 4 Sup. Ct. 420, 28 L. Ed. 415; Bauserman v. Blunt, 147 U. S. 647, 13 Sup. Ct. 466, 37 L. Ed. 316; Trimble v. Doty, 16 O. St. 119; Coal & Car Co. v. Norman, 49 O. St. 598, 32 N. E. 857; O'Donohue v. Hendrix, 13 Neb. 255, 13 N. W. 215; U. P. Ry. Co. v. Estes, 37 Kan. 229, 15 Pac. 157; Mo. Pac. Ry. Co. v. Webster, 3 Kan. App. 106, 42 Pac. 845; Cox v. Peoria Mfg. Co., 42 Neb. 660, 60 N. W. 933; Schofield v. Terr., 9 N. M. 526, 56 Pac. 306; Fletcher v. Dunbar, 21 La. Ann. 150; Hunter's App., 71 Conn. 189, 41 Atl. 557; Zieverink v. Kemper, 19 Wkl. L. Bull. (Ohio) 270.) It is said in Kansas that the only effect of filing the answer and participating in the trial is that the question of error in the ruling on the demurrer cannot be taken to the reviewing court until the remainder of the case is so taken. (Ry. Co. v. Webster, *supra.*) And it is held in that state that a defendant whose demurrer has been overruled may elect to stand on the demurrer and at once take the case to the Appellate Court; or, an answer may be filed, and when the case is finally tried, if it is tried on the original petition, the case may then be taken to the Appellate Court by the party demurring, and the ruling on the demurrer will be passed on there. (Ry. Co. v. Estes, *supra.*)

The rule is clearly stated by the Supreme Court of the United States in Teal v. Walker, *supra,* as follows: "The writ of error is not taken to reverse the judgment of the court upon the demurrer to the complaint, for that was not a final judgment, but to reverse the judgment rendered upon the verdict of the jury. The error, if it be an error, of over-ruling the demurrer could have been reviewed on motion in arrest of judgment, and is open to review upon this writ

of error. When the declaration fails to state a cause of action, and clearly shows that upon the case as stated the plaintiff cannot recover, and the demurrer of the defendant thereto is overruled, he may answer upon leave and go to trial, without losing the error in overruling the demurrer. The error is not waived by answer, nor is it cured by verdict. The question, therefore, whether the complaint in this case states facts sufficient to constitute a cause of action, is open for consideration."

The same rule is announced in the Connecticut case above cited, the court so holding on the ground that by statute the defendant had an absolute right to plead over after demurrer overruled, and, therefore, the right to take every objection open to him in one and the same suit, without being compelled to elect between matters of law and matters of fact in presenting the issues to be tried and determined. In Zieverink v. Kemper, *supra,* decided on error by the Superior Court of Cincinnati, where a demurrer on the ground that it appeared on the face of the petition that the action was barred by the statute of limitations was filed and overruled, and after the demurrer was overruled an answer was filed which did not plead the statute, it was held that the error in overruling the demurrer was not waived, and the provisions of the code requiring that judgment be rendered in favor of the party entitled thereto upon the statements in the pleadings, notwithstanding a verdict against him, was referred to as sufficient to sustain the decision. It was further held that having raised the question of the bar of the statute by demurrer, the facts appearing by the petition, it was not necessary to tender the same defense a second time by answer after it had been decided adversely to the defendant. The judgment was reversed for the error in overruling the demurrer.

The reasons for requiring a demurrer to be withdrawn upon pleading over, or treating that as done, do not exist where an appeal or proceeding in error can only be taken from a final order or judgment in the case, and a party is

permitted to except to the overruling of his demurrer and
then plead over.  Where that practice is provided for it is
clearly intended that after the issue of law is determined
by the decision of the court adversely to the demurrant, he
may then tender an issue of fact before the rendition of final
judgment upon the issue of law, without waiving the error,
if any, in the decision on that issue.  Otherwise an election
between the issue of law and a proposed issue of fact would
be required without the right to present the issue of fact
if electing to stand upon the demurrer, or to have the de-
murrer passed on by the reviewing court if electing to sub-
mit an issue of fact; that this was not intended is disclosed
by the various provisions of the code relating to the plead-
ings, the trial, and proceedings in error.  One of the reasons
assigned for a withdrawal of the demurrer upon pleading
over is that a demurrer admitting the facts and an answer
denying them are totally inconsistent with each other and
cannot stand together.  (Pickering v. Telegraph Co., 47 Mo.
457.)  But it is not true in fact that a demurrer admits the
allegations of the pleading demurred to, for nothing is there-
by affirmatively or expressly admitted.  It merely denies the
legal sufficiency of the facts alleged, and hence such facts
are said to be admitted, and, impliedly, they are admitted,
but solely for the purpose of testing their sufficiency in law.
When the demurrer is overruled the implied admission has
served its purpose.  (Brewing Ass'n. v. Bond, 66 Fed. 653,
13 C. C. A. 665; Belden v. Blackman, 124 Mich. 667, 83 N.
W. 616; Donovan v. Boeck, 217 Mo. 70, 116 S. W. 543;
Bliss on Code Pl., Sec. 418.)  It thereafter remains on the
record as an overruled demurrer, at least when an exception
is noted to the ruling, if it continues on the record at all, and
when permitted to so remain it cannot be regarded as an
admission and therefore evidence of the facts necessary to
be proved to establish the cause of action or defense upon the
trial of the issues of fact arising upon subsequent pleadings.
Since the code allows a proceeding in error only from the
final judgment, that judgment, when rendered after a trial

of an issue of fact arising upon pleadings filed after the overruling of the demurrer, is to be regarded as rendered upon all the issues in the cause—the issue of law as well as the issue of fact, or, at least, as a final judgment authorizing an appellate proceeding to question the correctness of the decision on the issue of law as well as the issue of fact, for the code contains nothing disclosing an intent to deprive a party of the right to challenge by a proceeding in error the correctness of the decision of the trial court upon both issues, or an issue of fact as well as an issue of law. (Mechanics Bank v. Woodward, 74 Conn. 689, 51 Atl. 1084.) Of course by pleading over and going to trial upon the merits the party takes the chances of the defect in the pleading being aided or cured, under the rules above explained. But as he cannot appeal from the mere ruling on the demurrer and, believing that he has a good claim or defense upon the facts, may be unwilling to sacrifice the right to present an issue thereon by standing on his demurrer and allow judgment to be then rendered, the only proper and logical view, we think, is that through the remainder of the proceedings, when he has answered over, he retains the benefit of his exception to the ruling on the demurrer. Thus the same right is accorded him that would be his if allowed an appeal from that ruling, though the result may be somewhat affected by the rules for aiding or curing the alleged defect.

Unlike the statute in Connecticut our code does not expressly confer upon a party an absolute right to further plead after his demurrer has been overruled, but it does provide that he may do so if the court is satisfied that he has a meritorious claim or defense, and did not demur for delay. (Comp. Stat. 1910, Sec. 4436.) And the prevailing practice here under that provision is to grant the leave almost as a matter of course upon a mere request. Although the matter is discretionary with the court, when the leave is given it is full and complete, and no reason is perceived for applying a rule different from that which would prevail under a statute giving an absolute right without requesting leave. The code

does not expressly, at least, require a withdrawal or abandonment of the demurrer or the exception to the ruling thereon on requesting leave to plead further, nor is such withdrawal or abandonment mentioned as a condition upon which the leave may be granted. Giving effect to the various provisions of the code, no substantial reason is perceived for implying the withdrawal of a demurrer by pleading over after it is overruled and the ruling excepted to, or that the statute so requires. We think it proper, therefore, to follow the practice hitherto established, which permits a consideration of the ruling on the demurrer when duly excepted to and assigned as error, upon a review of the final judgment. For the several reasons stated the motion to dismiss must be denied.

3. Whether the assignment of error based upon the overruling of the demurrer be considered or either of the other assignments, the same question is presented, viz: the sufficiency of the facts alleged to entitle the plaintiff below to appropriate the property of the defendant through the power of eminent domain. In addition to the facts previously stated, it is alleged that the plaintiff has accepted the constitution of this state and complied with the laws thereof with reference to foreign corporations doing business in this state, and is duly and legally authorized to transact business here. That the land to be irrigated and reclaimed situated in Weld County, Colorado, was granted by the United States prior to the adoption and ratification of the constitution of this state, and a large part of such land is now owned by the plaintiff. That in July, 1910, the plaintiff was granted the right and authority by the State Engineer of Colorado to divert and appropriate water from Crow Creek for the purpose of irrigating said lands and that it has the right to divert and appropriate the unappropriated water of said stream for that purpose. That it is impracticable and impossible to construct a headgate and divert the water of the stream within the State of Colorado to irrigate and reclaim said lands, "because of the lay of the land and the condition of the soil";

and that there is a suitable location for the headgate for plaintiff's irrigation system on the land of defendant in this state, and about 700 feet from the southern boundary line thereof.   Certain applications alleged to have been filed by the plaintiff in the office of the State Engineer of this state for a permit to divert and appropriate water from Crow Creek in this state for the purpose aforesaid are set out in full, together with alleged indorsements thereon and correspondence relating thereto, whereby it is claimed and alleged that plaintiff acquired a right to so construct the headgate, and divert and appropriate water of said stream not theretofore appropriated.   It appears to have been stated in one of said applications filed as an amendment, and it is alleged in the amended petition, that the proposed point of diversion is below any diversion from said stream previously authorized, or that could be made for any beneficial use within this state; that such proposed diversion will not interfere with or injuriously affect any prior appropriation within this state, nor in any way result to the detriment of the public interest or welfare; and that there is ample unappropriated water going to waste each year in said stream during flood time, which can be diverted through plaintiff's irrigation and reservoir system to annually irrigate and successfully reclaim all the lands proposed to be irrigated and reclaimed by the means of that system.

If the purpose for which the headgate and ditch is proposed to be constructed is such as would authorize the condemnation of land in this state, the question of the necessity for locating the headgate and part of the ditch on the land in controversy and taking the land sought to be condemned is eliminated from the case by the manner in which the record comes to this court, and such necessity stands established by the judgment, in case a right to condemn for the proposed use is shown by the facts alleged.   We understand it to be admitted that the amended petition states all the facts that could be stated or shown to justify condemning the land, and that they were fully and particularly stated in

order that the legal issue might be fairly and clearly presented by demurrer.

Two points are urged against the right to condemn.  First, that land in this state cannot be taken by condemnation where the only proposed use, as in this case, is the irrigation of lands in another state; second, that to condemn land required for an irrigating ditch or irrigation purposes it is necessary to show a right or permit to divert and appropriate water therefor, and that the amended petition fails to show that such a right or permit was acquired by the plaintiff in this state.  It is argued in support of the second proposition that it is beyond the authority of the State Engineer to grant a permit or authorize the diversion and appropriation of water in this state for the irrigation of land outside the boundaries of the state, and, further, that had he such authority the facts alleged do not show that a permit was granted or that the proposed diversion and appropriation by the plaintiff was authorized.

It will not be necessary to consider the second proposition or either of its divisions suggested by the argument, for in the view we take of the case the fact that all the water to be diverted by means of the headgate and ditch is to be used exclusively for the irrigation of land in another state is sufficient to cause a reversal of the judgment.  Eminent domain is generally defined as the right or power of a sovereign state to appropriate private property to particular uses, for the purpose of promoting the general welfare.  "It embraces all cases where, by authority of the state and for the public good, the property of the individual is taken, without his consent, for the purpose of being devoted to some particular use, either by the state itself or by a corporation, public or private, or by a private citizen."  (1 Lewis on Em. Domain, 3rd Ed., Sec. 1.)  In this respect the several states are distinct and independent of each other, respectively possessing and exercising the power for their own purposes or their own public welfare.  "The eminent domain in any sovereignty exists only for its own purposes."

(Trombley v. Humphrey, 23 Mich. 471, 476, 9 Am. Rep. 94.) "It means nothing more or less than an inherent political right, founded on a common necessity and interest, of appropriating the property of individual members of the community to the great necessities of the whole community." (Bloodgood v. R. R. Co., 18 Wend. (N. Y.) 9, 31 Am. Dec. 313.) "The proper view of the right of eminent domain seems to be, that it is a right belonging to a sovereignty to take private property for its own public uses, and not for those of another. Beyond that, there exists no necessity; which alone is the foundation of the right." (Kohl v. U. S., 91 U. S. 367, 23 L. Ed. 449.)

If the particular improvement or use will be of sufficient benefit to the people of the state to authorize an exercise of the power, it will not be prevented by the fact that the people of another state will also be benefited. (Gilmer v. Lime Point, 18 Cal. 229; Washington Water Power Co. v. Waters, 19 Idaho, 595, 115 Pac. 682; Columbus W. & W. Co. v. Long, 121 Ala. 245, 25 So. 702.) It was said in the California case, that it is not essential that the use or benefit should be exclusively for the people of the state, or exclusively for even a portion of those people, "that the people of California have no right to complain that the people of Oregon are also benefited by a public improvement," and that such improvement would be none the less a public use in California because it was also useful elsewhere. And in the Idaho case it was said: "but where the use for which condemnation is sought is a public use in this state, and will serve the citizens of this state—their demands, necessities and industries—the fact that it may incidentally also benefit the citizens and industries of a neighboring state will not defeat the right of condemnation."

There is some conflict in the authorities as to the right of a state to exercise its power for the benefit of the United States government. That right was denied in Michigan. (Trombley v. Humphrey, *supra.*) It was upheld in California. (Gilmer v. Lime Point, *supra.*) But it was con-

ceded in the Michigan case, and is now well settled, that for
its own purposes the general government possesses the
power of eminent domain and may acquire land by con-
demnation in any state, such right being sustained upon the
ground that property required for the purposes of the na-
tional government, being for the use of the people of all
the states, is as well for the use of the people of that state
where it is located. (1 Lewis on Em. Dom., 3rd Ed., Sec.
309; Cooley's Const. Lim. 526; Reddall v. Ryan, 14 Md.
444, 74 Am. Dec. 550.) The Maryland case involved the
taking of land in that state for an aqueduct to supply water
to the City of Washington, the same having been authorized
not only by an act of Congress, but also by an act of the
Legislature of Maryland. It was contended that the use
was not a public use in Maryland, and an elaborate argu-
ment was made upon that proposition. The court held to
the contrary, giving as one of its reasons that Maryland was
one of the states of the Union, and, as such, "in some sense,
an integral part of the great public, interested in and con-
stituting a part of the general government," and could,
therefore, lawfully enact the statute authorizing the con-
demnation proceedings. And it was said that the words
"public use" in the provision of the constitution of the state
requiring just compensation to be made for property taken
therefor, "do not mean merely a use of the government of
Maryland, or of the State of Maryland, and its inhabitants
as such, but, in our opinion, they embrace within their scope
a use of the government of the United States." It was also
said in the case that by its cession of the District in which
the City of Washington was situated Maryland had not
intended to abandon all interest in that District, and, there-
fore, the relation between the District and the State was
more intimate and close than that which it bears to any
other state.

It will be noticed that in the cases cited it was deemed
necessary to sustain the exercise of the power that the par-
ticular use have some substantial relation to a public pur-

pose and the public interest and welfare of the state wherein
the land to be taken is located.    And this thought runs
through all the cases discussing the question of public use,
or a use permitting or justifying the taking of private prop-
erty by eminent domain.    That is true in the case of In re.
Townsend, 39 N. Y. 171, upon which counsel for defendant
in error, plaintiff below, strongly rely in support of the
judgment.    That case demands more than a passing notice,
for upon the facts it seems to us to be the only one that
might be supposed to lend some support to the theory. upon
which the right of condemnation is claimed in the case at
bar.    It does not, we think, support the right claimed in this
case, for the statute authorizing the taking was upheld on
the ground that the improvement, a canal in New Jersey,
served the State of New York and contributed to the wel-
fare of its people in precisely the same way that it benefited
the people of New Jersey, or as though it had been built
within the limits of New York.    The canal company was
incorporated in New Jersey to construct a canal to unite the
Delaware River, near Easton, in the State of Pennsylvania,
with the tide waters of the Passaic, in New Jersey, and was
subsequently authorized to continue the canal to the waters
of the Hudson, at or near Jersey City.    It was declared in the
act incorporating the company, that when completed the
"canal shall forever thereafter be esteemed a public highway,
free for the transportation of any goods, commodities or
produce whatsoever on payment of tolls."    It was a canal
for transportation purposes.    At the outlet of a lake situated
partly in New York, but mostly in New Jersey, a dam was
built by the company to form a reservoir as a feeder for the
canal, and thereby some of the land of the appellant in the
case situated on the margin of the lake in New York was
flooded.    By an act of the Legislature of New York the
company was authorized to acquire title to any land injuri-
ously affected by the dam or reservoir by the appointment of
commissioners to appraise the compensation.    The principal
question in the case was whether the taking was for a public

use, in view of the fact that the canal itself was not located within the limits of the State of New York. A few quotations from the opinion, and also from the opinion of one Justice who dissented from the conclusion only upon other questions in the case, will serve to show clearly that the New York statute was sustained on the ground that the benefits accruing to the people of New York were of the same character as though the canal had been constructed within the limits of that state. In the opinion of the court it was said:

"It does not follow, because the canal is outside the state limits, that its construction and maintenance are not for a public use, within the meaning of our Constitution. If it were within our limits, what are the public benefits to result from its construction? Not merely that our citizens may use it for transportation and travel. Providing transportation to market and facilitating intercommunication are some of the public purposes of such improvements; but communication between our chief cities and the productive regions which lie outside our state, and intercourse with those who dwell there, are as truly objects of public interest and advantage as between two sections of the state itself. Besides, the court cannot say that the Morris canal does not run within the reach of a portion of our own citizens, and directly aid them in the conduct of their intercourse with our Eastern border, or the counties along the Hudson river to which it runs."

In the dissenting opinion the fact is referred to that the canal terminates directly opposite the city of New York, "where concentrates, not only the internal trade and business of all the States of the Union, but, to a considerable extent, the trade and commerce of the whole world. * * * Every avenue opened for the accommodation of those who have occasion to contribute to its augmenting inland trade, or facilitate the transportation of the vast amount of merchandise which is disposed of within its limits, or the entrance or departure of those who may have occasion to visit or to leave it, is of paramount importance. * * * Suppose the

depot of the Morris Canal Company had been located immediately across and adjoining the boundary line of the State of New Jersey, and within the limits of New York; could there be any doubt that the land taken for such a purpose would be for the public use? Most certainly there would not. It does not, then, alter the case, because the Hudson river separates the terminus of the canal company from immediate connection with the State of New York. It accommodates the citizens of New York precisely as much, and the public are equally benefited, and, as such, interested, as if the depot was located on the opposite side of the river, and it is quite as much for the public use." Reference is made in both opinions to the railroads of other states which are authorized to construct a part of the line in New York. And the right of condemnation appears, we think, to have been sustained on the same ground and for the same reason that the right of a railroad company is sustained whose road is mainly in another state, to condemn land in the state for a part of the line or terminal station inside the state limits. Throughout both opinions the principle is recognized that the term public use in connection with eminent domain has reference to the state or government within whose territorial limits is situated the land proposed to be taken, and by whose authority the same must be taken, if at all. And that principle is, we think, to be deduced from all the authorities, although distinctly stated in but few, for, as above suggested, in every case where the use as a justification for the proceeding has been questioned, the inquiry in that respect has been confined to the interest and welfare of the state or sovereignty within whose limits or jurisdiction the land sought to be condemned is located. This does not mean the interest or welfare dependent upon or affected by development and growth in another state. In the case cited and quoted from, the benefit to the people of New York held sufficient to support condemnation was not the interest or advantage to be derived from the upbuilding of the industries or development of the resources of the neighboring state of New Jersey, but

the benefit to arise directly from service rendered in the operation of the canal. The canal itself would serve the people of New York, and was, therefore, held to be a public use in and of that state.

In Lewis on Eminent Domain, it is said: "The public use for which property may be taken is a public use within the State from which the power is derived." (Sec. 310.) The Supreme Court of Alabama say: "It seems to be an admitted fact generally, that the power inheres in a State for domestic uses only, to be exercised for the benefit of its own people, and cannot be extended merely to promote the public uses of a foreign State." But it was held that the right is not to be denied where public uses are subserved in the State granting condemnation, because in connection therewith public uses in another state may likewise be promoted. And the principle was applied in favor of a corporation engaged in supplying water to two cities in Alabama and to one city in Georgia, the court saying: "While a State will take care to use this power for the benefit of its own people, it will not refuse to exercise it for such purpose, because the inhabitants of a neighboring state may incidentally partake of the fruits of its exercise." (Columbus W. W. Co. v. Long, 121 Ala. 245, 25 So. 702.)

In the Idaho case of Washington Water Power Co. v. Waters, 19 Idaho, 595, 608, 115 Pac. 682, 686, above cited, the same doctrine was stated, and while the fact that another state might be incidentally benefited was not deemed sufficient to deny condemnation for an improvement which would be a public use in Idaho, it was said: "Condemnation could evidently not be had in this state for the purpose alone of serving a public use in another State." (115 Pac. 682, 686. See also Walbridge v. Robinson, 22 Idaho, 236, 125 Pac. 812.) The same principle is suggested in the recent case of Thayer v. California Development Co., (Cal.) 128 Pac. 21, where it was said as to a water or irrigation company diverting water in California, conducting it into Mexico and back again into California: "The fact that that com-

pany is carrying on a public service in Mexico and has devoted some water to public use there does not affect the water carried into the United States nor the character of the use thereof in California," and, though it was not a condemnation case, but one involving the question whether the company had appropriated and was engaged in conducting water in its canal or canals for public use, it was said that the company in California did not possess the power of eminent domain.

It is said in Nichols on the Power of Eminent Domain:. "It has been intimated that one State cannot condemn property within its limits for the use of another State (citing Kohl v. U. S. *supra*), and a taking for such a purpose has never received the sanction of the courts." (Sec. 22.)   In the same section Townsend's Case, *supra*, is referred to as furnishing no exception to the proposition, the author saying that the statute considered in that case was sustained on the ground that the canal was of great benefit to New York as well as New Jersey, and "if this feature had been lacking the decision would probably have been otherwise, as there would have been no use, public to New York, to be subserved." It is also well settled that a State cannot take or authorize the taking of property or rights in property situated in another State.   (Nichols on Em. Dom., Sec. 19; 1 Lewis on Em. Dom., 3rd Ed., Sec. 385: 10 Ency. L., 2nd Ed., 1051; Crosby v. Hanover, 36 N. H. 404; U. S. v. Ames, 1 Woodb. & M. 76, Fed. Cas. No. 14,441; Ill. State Trust Co. v. St. Louis T. M. & S. Ry. Co., 208 Ill. 419, 70 N. E. 357.)   "One state cannot expropriate for its public purposes property *within the territory of another state.*" (McCarter v. Hudson W. Co., 70 N. J. Eq. 695, 65 Atl. 489, 14 L. R. A. (N. S.) 197, 207, 118 Am. St. 754, 774, 10 Ann. Cas. 116, 125.) "The question has arisen whether, by virtue of the right of eminent domain, one state can take, or subject to public use, land in another state, and the decisions have naturally been against such a power." (Holyoke W. P. Co. v. Conn. R. Co., 52 Conn. 570, 575; s. c. (C. C.) 20 Fed. 71, 79.)

The principles above stated seem to have been recognized by the trial court in this case, if we may refer to a quotation from the opinion of the learned judge found in the brief of counsel for defendant in error, for the ground of the decision seems to have been that the proposed irrigation of the lands, which lie just over the line of this state in the State of Colorado, will be of material benefit to a considerable part of the inhabitants of a section of this state, since it may lead to the growth of towns and the creation of new channels for the employment of capital and labor. And counsel argue that such a benefit is sufficient. In the part of the opinion of the trial court found quoted in the brief it was said that "the court will take judicial notice of the fact that the city of Cheyenne and several incorporated towns of Wyoming are located so near the lands, which it is proposed to irrigate, that such lands may be considered tributary thereto, and that the development and settlement of these lands would be of considerable benefit to the citizens of this State residing in said city and towns. It may be that in the future a town may be located within the State of Wyoming, and within but a few hundred feet of these lands, and even should such town, or the immediate trading point for the future settlers upon these lands, be located within the State of Colorado, the central trading point for wholesale purposes, and for the larger wants of the settlers of these lands, would be the City of Cheyenne. Therefore, it cannot be said that the ultimate purpose of the exercise of eminent domain in this case would not result in benefit to the people of this state. Unquestionably, the developing and settling of several miles of the northern portion of Colorado, immediately adjacent to Wyoming, would be of great benefit to the citizens living just over the line in Wyoming." This line of argument is not without some force, but we think it disregards or misconceives the theory or public interest supporting the exercise of eminent domain for irrigation works or the irrigation of land, and would, in effect, if sustained, permit the exercise of eminent domain in this state by the State of

Colorado, or any other state, for its own uses and purposes.

We are not required in this case to discriminate between a public use and a private use with reference to the taking of property under the power of eminent domain, for, whether our constitution is to be understood as authorizing such taking for a use distinctively private, as distinguished from a public use, when the purpose thereof is irrigation, or as declaring that any taking for irrigation purposes is for a public use, it clearly authorizes a taking for such purpose. It is provided in the Constitution as follows: "Private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity, and for reservoirs, drains, flumes, or ditches on or across the lands of others for agricultural, mining, milling, domestic or sanitary purposes, nor in any case without due compensation." (Art. I, Sec. 32.) "Private property shall not be taken or damaged for public or private use without just compensation." (Art. I, Sec. 33.) It was said in Washington, referring to a provision like that contained in Section 32: "Here is an inference so strong as to amount almost to an affirmative declaration that private property may be taken for private use when the use is confined to the purposes enumerated in the provision, one of which is ditches on or across the land of others for agricultural purposes; and it is no strained construction of the provision to say that this includes ditches for irrigation purposes, in view of the vast extent of arid land within our state and the benefits of irrigation thereto in the increase of its productiveness and value. The very thought of agriculture in connection with this vast arid portion of our state suggests irrigation in connection therewith." (State v. Superior Court, 59 Wash. 621, 110 Pac. 429, 140 Am. St. 893.) It is, however, proper that we consider the use for such a purpose in its relation to the necessities and welfare of the state, to ascertain the reason for the provision found in Section 32 and what was thereby intended to be accomplished, or what interest of the people was intended to be served, for it is not to be supposed that

the intention or purpose was to take the property of one and give it to another, even upon the payment of just compensation, without some public necessity or advantage. Nor is it to be supposed that it was intended to authorize a taking for private use, which would not be a public use when participated in by all or many who could and might desire to be accommodated by the proposed reservoir, flume or ditch. If a reservoir or ditch constructed for irrigation purposes and to furnish water to any who might apply therefor within the district proposed to be irrigated would not, when considered as a public use, authorize a taking of property in this state, such taking would not be authorized for a private use covering the same district. In this respect under the constitutional provisions aforesaid there is no difference between a public use and a private use. A private use for any of the purposes mentioned in Section 32 is given the same force and effect as a public use, and no greater. In State v. Superior Court, *supra*, the court say: "We have quoted the constitutional provision which clearly indicates that property may be taken under the power of eminent domain for certain enumerated private uses, among which are ways for ditches for agricultural purposes. While this provision in terms seems to give the power for private use, it was evidently adopted upon the theory that the public would be sufficiently benefited by the taking for such a purpose to warrant the taking; that is, though it be seemingly called a private use by these words of the constitution, it is also in effect a public use in view of the necessities of a state like ours having vast areas of arid land." Even without such constitutional provision the taking of land for an irrigating ditch in the Western States where the lands are arid or semi-arid has been upheld as for a public use, regardless of the number of acres or distinct tracts or farms to be irrigated or the number of independent owners, such taking being held permissible for the purpose of irrigating land owned by a single individual. (Oury v. Goodwin, 3 Ariz. 255, 26 Pac. 377; Nash v. Clark, 27 Utah, 158, 75 Pac. 371, 1 L. R. A. (N. S.)

208, 101 Am. St. Rep. 953, 1 Ann. Cas. 300; Clark v. Nash, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171; Fallbrook Irr. Dist. v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369.)

What, then, we inquire, is the public necessity, benefit or advantage that justifies the taking of land for an irrigating ditch or other irrigation works? Mr. Kinney, in his work on Irrigation and Water Rights, says that the reclamation of lands in the Western States has been declared a public use, in the aid of which the right of eminent domain may be exercised, upon the theory that although it may benefit the individual directly, the indirect benefit to the general public is greater by permitting the upbuilding and settlement of the country." (Vol. 2, 2nd Ed., Sec. 1066.) And again, referring to the line of authorities as to what constitutes a public use holding that a private individual or corporation may condemn rights of way for ditches where the sole use of the water is by the individual or corporation, that author says: "This is upon the theory that the physical and climatic conditions of the State are such that the promotion of any great industry, such as irrigation, * * * is of sufficient importance in the upbuilding of the country and the developing of its natural resources, that such a use is a public benefit to the community at large, and, therefore, it is a public use, even if the more direct benefit is to a private individual or corporation." (Id. Sec. 1069.) Speaking on this question another author refers to the fact that where the State is dependent for its prosperity on the irrigation of its arid lands as a whole, it is held immaterial whether one or many proprietors are benefited by a particular enterprise. (Nichols on Em. Dom. Sec. 253.) And, referring to the case of Fallbrook Irr. Dist. v. Bradley, *supra,* it is said that the court rested its decision on the ground that in a state, like California, embracing millions of acres of arid lands which when left in their original condition would present an effectual obstacle to the advance of a large portion of the state in material wealth and prosperity, irrigation thereof

would benefit the public of the whole state, and was, there-
fore, a public use. (Id. Sec. 252.) In the case so referred
to, Mr. Justice Peckham, delivering the opinion of the court,
said on this subject: "While the consideration that the work
of irrigation must be abandoned if the use of the water may
not be held to be or constitute a public use is not to be re-
garded as conclusive in favor of such use, yet that fact is
in this case a most important consideration. Millions of
acres of land otherwise cultivable must be left in their
present arid and worthless condition, and an effectual ob-
stacle will therefore remain in the way of the advance of a
large portion of the State in material wealth and prosperity.
To irrigate and thus bring into cultivation these large masses
of otherwise worthless lands would seem to be a public
purpose and a matter of public interest, not confined to the
landowners, or even to one section of the State."

In the case of Nash v. Clark, *supra,* the Supreme Court
of Utah sustained the right of eminent domain in cases of
this character solely on the ground that the irrigation of the
arid lands of the State is a public benefit. The court, speak-
ing by Mr. Justice McCarty, say: "In view of the physical
and climatic conditions in this state, and in the light of the
history of the arid West, which shows the marvelous results
accomplished by irrigation, to hold that the use of water for
irrigation is not in any sense a public use, and thereby place
it within the power of a few individuals to place insurmount-
able barriers in the way of the future welfare and prosperity
of the State would be giving to the term 'public use' alto-
gether too strict and narrow an interpretation." The case
was affirmed by the Supreme Court of the United States.
(Clark v. Nash, *supra.*) The rule of that case, that private
enterprise may constitute a public use, is summarized in
Wiel on Water Rights (2nd Ed., Sec. 263) as follows:

"The situation of a State and the possibilities and neces-
sities for the successful prosecution of various industries,
and peculiar condition of soil or climate or other peculi-
arities, being general, notorious and acknowledged in the

State so as to be judicially known and exceptionally familiar
to the courts without investigation—such conditions justify
a State court in upholding a statute authorizing the taking
of another's private property by one individual for his own
enterprise, where it believes, *by reason of the above,* that
such a taking will, through its contribution to the growth
and prosperity of the State, constitute a public benefit, and
the Supreme Court of the United States will follow the
decision of the State court in such a case."

Stating the reason and the necessity causing the enact-
ment of statutes and the adoption of the rule in the other
arid land states permitting the exercise of eminent domain
for the purposes of irrigation, and applying the rule in Ne-
braska, the Supreme Court of that state say:

"Nor were the conditions surrounding the people of the
Pacific states, when the foundation was laid for the body
of their laws upon the subject, materially different from
those which today confront the western half of our own
state. We behold what was but yesterday the public domain,
occupied to the western limit of the rain belt, so called, and
settlers eagerly seeking for homes in the semi-arid region
beyond. We behold thousands of acres of fertile land in the
valleys of the Platte, the Loups, the Elkhorn, and the Re-
publican rivers, practically worthless under existing con-
ditions for the purpose of agriculture, but which by appli-
cation of the waters of those streams may be made most
productive, thus not only supporting the rapidly increasing
population of that region, but adding largely to the wealth
and material prosperity of the state. That an undertaking
so important can be prosecuted alone through the agency of
the state none can doubt. The reclamation of a region so
vast, equal in extent to more than one State of the Union,
is surely a legitimate function of government. And the ex-
ercise of the reserve power of the state in the promotion of
an enterprise so beneficial is not even in a technical sense
violative of the restrictive features of, the constitution."
(Paxton & Hershey Irr. Co. v. Farmers & Merchants Irr.

Co., 45 Neb. 884, 64 N. W. 343, 29 L. R. A·. 853, 50 Am. St. Rep. 585.)

So in the Washington case above cited (State v. Superior Court) it is said: "The benefit to the public which supports the exercise of the power of eminent domain for purposes of this character is not public service, *but is the development of the resources of the state,* and the increase of its wealth generally, by which its citizens incidentally reap a benefit. Whether such development and increased wealth comes from the effort of a single individual, or the united · efforts of many, in our opinion does not. change the principle upon which this right of eminent domain rests."

Expressions similar to those contained in the cases above quoted from are found in all the cases relating to the exercise of the power of eminent domain for rights of way for irrigating ditches, whenever stating the principle upon which the exercise of that power for such purpose rests. In none is the exercise of the power for such a purpose based upon the necessities, or the physical and climatic conditions of another state. But it is founded upon the conditions and necessities of the State where the power is to be exercised. And that is true also as to other purposes more or less analogous. Where the development of mines is held to be a public use, it is because of the public necessity of developing the mining resources of the State and the public benefit resulting from such development. (Dayton Min. Co. v. Seawell, 11 Nev. 394; Butte &c Ry. Co. v. Montana U. Ry. Co., 16 Mont. 504, 41 Pac. 232, 31 L. R. A. 298, 50 Am. St. 508.) The building of grain elevators was held to be public use in Minnesota on the ground of public necessity in view of the magnitude of the agricultural interests of that State. (Stewart v. Great Nor. Ry. Co., 65 Minn. 517, 68 N. W. 208, 33 L. R. A. 427.) And in sustaining a statute as a proper exercise of the power of eminent domain, which authorized the taking of a right to flow land for mill purposes without the landowner's consent, but upon making due compensation to be assessed in a proceeding provided for that purpose,

the court referred to the interest of the State in the improvement of her water powers and the prosperity arising to the State from the development of those natural resources. The court said: "No State of the Union is more interested than ours in the improvement of natural advantages for the application of water power to manufacturing purposes. * * * The present prosperity of the State is largely due to what has already been done towards developing these natural advantages." And again: "The business of manufacturers and mechanics in this State is largely dependent on the use of the water power. To create a water power in a large stream sufficient for manufacturing on an extensive scale, it is generally necessary to dam the water in the stream itself, and also to raise and retain it in natural or artificial reservoirs connected with the stream. * * * In most cases, to do this, the right to flow the land of numerous proprietors must be obtained; and an individual, or a few individuals, might defeat or greatly embarrass the whole enterprise by an unreasonable and obstinate refusal to part with this right. In such a case can it be doubted that, to remove this obstacle to a great public improvement, in which large numbers are interested, would be, in the language of the constitution, 'for the benefit and welfare of the State,' and that a private right taken for that purpose would be taken for a public use within the legal meaning of that term." (Great Falls Mfg. Co. v. Fernald, 47 N. H. 444.)

The irrigation of land in a neighboring state, and so also the building of a railroad in that State, or the development of its mines or other natural resources, may no doubt result in some benefit to the people of this state, but only in the general way that one State is benefited by the growth in industrial activities, population and wealth of an adjoining State, or even of a more distant State or the Nation at large. To accept that, however, as a sufficient reason for taking land in this State under the power of eminent domain, if for the purpose of irrigation, would not tend to advance the interest of this State in the reclamation and cultivation of its

lands, or the development of its natural resources, but the effect might be entirely the reverse, and it would abandon the principle upon which the right to exercise the power for irrigation and other analogous purposes has been asserted and maintained. The headgate and ditch by which water for agricultural purposes is diverted and distributed is not the use for which land required for a right of way is taken; the use authorizing such a taking is the application of the water to the land. The use, whether public or private, therefore, occurs where the water is applied; that is, where the land to be irrigated is located. If located in another State the use is there, and that use must support the exercise of eminent domain for a right of way for the ditch, if it is to be supported. Since in this case it appears that no land in this State will receive for its reclamation or cultivation any of the water to be diverted or distributed by means of the ditch, but the water is to be entirely devoted to the irrigation of land in another State, the use will be in and for that State —for its uses and purposes, and not in this State or for any of its purposes. The principle above discussed, that the power of eminent domain will be exercised by a State for its own purposes, and not for the use of another State, seems, therefore, to be applicable. Clearly the State of Colorado cannot exercise the power in this State, and any authority conferred by its laws to do so would be void, for it is fundamental that the sovereignty of any government is limited to persons and property within the territory it controls. (Nichols on Em. Dom., Sec. 19; Trombley v. Humphrey, *supra*; Crosby v. Hanover, 36 N. H. 404; 1 Lewis on Em. Dom., (3rd Ed.) Sec. 385.)

While this State may be interested and even indirectly benefited in the manner above indicated by the reclamation and settlement of lands in another State, it would be difficult, we think, to uphold the exercise of emident domain in this State on the ground that such reclamation and settlement in another State is a necessity of the government of this state, in view of the fact that within its own boundaries and in all

parts of the State there are vast areas yet uncultivated capable of irrigation and reclamation. And this power of eminent domain is founded upon the law of necessity, for "no government," says Judge Cooley, "could perpetuate its existence and further the prosperity of its people, if the means for the exercise of any of its sovereign powers might be withheld at the option of individuals." That eminent jurist further says that the power to appropriate must in any case be justified and limited by the necessity; "and whenever in any instance the government or its officials shall attempt to seize and appropriate that which cannot be needful to the due execution of its sovereign powers, or the proper discharge of any of its public functions, the same means of resistance and legal redress are open to the owner that would be available in case of a like seizure by lawless individuals." (Trombley v. Humphrey, *supra.*)

It is not necessary to rest our conclusion alone upon a consideration of these general principles, though we would feel content to do so, in the absence of authority upon the precise question here presented. With the exception of the statement found in the opinion in Thayer v. California Development Co., *supra,* to the effect that a public use in Mexico of water appropriated and diverted in California would not authorize the exercise of eminent domain in California, the specific question as to the right to condemn land in one State for a ditch to irrigate land in another State does not seem to have been decided or considered by any court, although we think the various judicial expressions and intimations are all against such a right. But the question as relating to other uses of the water of natural streams has been considered and the right to take land in one State under the power of eminent domain for an enterprise or use in another State has been denied by the courts of the State wherein the land was located. We refer to cases arising under the so-called "Mill Acts." Those statutes, and the provisions made by them, are too familiar to require extended explanation. It is sufficient to say that the purpose

thereof is the encouragement of mills by authorizing their owners to erect a dam or dams and thereby overflow the lands of other persons, by paying such damages as may be assessed in the mode prescribed. The authorized proceeding in every material respect corresponds to a condemnation proceeding, and such statutes have been generally upheld as a rightful exercise of the power of eminent domain. (Ingram v. Water Co., 98 Me. 566, 56 Atl. 893; 1 Lewis on Em. Dom. (3rd Ed.) 280.) We have referred to a case decided in New Hampshire stating the ground upon which a taking for such a purpose has been sustained. Mr. Justice Clifford, in Holyoke Company v. Lyman, 15 Wall. 500, 507, 21 L. Ed. 133, alluded to the matter by saying: "Authority to erect dams across such streams for mill purposes results from the ownership of the bed and the banks of the stream, or the right to construct the same may be acquired by legislative grant, in cases where the legislature is of the opinion that the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain and to authorize such an interference with private rights. Lands belonging to individuals have often been condemned for such purposes, in the exercise of the right of eminent domain, in cases where, from the nature of the country, mill sites sufficient in number could not otherwise be obtained, and that right is, even more frequently, exercised to enable mill-owners to flow the water back beyond their own limits, in order to create sufficient power or head and fall to operate their mills."

It is apparent that with respect to the question before us there is a close analogy between the taking of land under the mill acts, where the taking is caused or required by the necessity for flowing the land to furnish power for the mill below, and the taking of land to construct a ditch to carry water for irrigation. In two cases the question arose as to the right to have the damage for such taking for mill purposes assessed under the statute of the State in which the land flowed was situated, where the mill was located in an-

other State, and in both cases the right was denied. (Wooster v. Great Falls Mfg. Co., 39 Me. 246; Salisbury Mills v. Forsaith, 57 N. H. 124. See also Gould on Waters, 3rd Ed., Sec. 593; U. S. v. Ames, 1 Woodb. & Min. 76, Fed. Cas. No. 14,441.) Referring to the statute of Maine the court in the case cited from that state, say: "The dam which causes the flowing—the mill for the benefit of which such flowing is permitted, and the land overflowed, or the property otherwise damnified by these erections, are assumed to be within the boundaries of the State, and within legislative jurisdiction." And, stating the conclusion of the court, it is said that "mills without the jurisdiction of the State, not being subject to the terms, conditions and regulations of the statutes, are not entitled to its benefits; and the common law remedy remains unaffected by its provisions."

In the New Hampshire case of Salisbury v. Forsaith, it was held that a mill owner having erected a dam on its land in another State, whereby the water was set back upon land in New Hampshire could not by petition have the damage assessed, and the rights of flowage ascertained and fixed under the New Hampshire statute for the encouragement of manufactures. The opinion contains an interesting and able discussion of the matter, and is particularly persuasive upon the question as it arises in this case, for it answers the argument here made, and which was made in that case, that a mill in the other State—Massachusetts would be a benefit to New Hampshire. The court say: "In order that land may be taken for this purpose against the owner's consent, the committee, and ultimately the court, must be satisfied that such taking is and may be of public use or benefit to the people of this State. I agree with counsel for the defendant that the act goes to the verge of the constitutional power of the legislature, and I may say that, but for the authorities by which the court thought they should be governed in the late case of Amoskeag Co. v. Head (56 N. H. 386), I should find great difficulty in sustaining it. But giving to the act the widest scope and effect which have been thought ad-

missible under the constitution, I think it must be said that the public use and benefit intended were those which would arise from the erection of mills and the employment of our water-power within our own limits, and not outside. It certainly may be, in one sense, of public use and benefit to the people of this State to have so good and so rich a neighbor on the south as our sister commonwealth of Massachusetts. Doubtless it may be of benefit to our people that every stream which flows from this State into that should be skirted with manufacturing establishments from the point where it leaves our borders to where it empties into the ocean; that thriving and opulent manufacturing town, should spring up along the line, although upon the other side; and that the industry, enterprise and thrift for which the people of that State are so justly renowned should be stimulated and encouraged by the exercise of a liberal comity in the making and administration of our laws. It may be of public benefit to the people of this state that the City of Chicago was rebuilt after the great fire which laid so large a part of it in ashes in the autumn of 1871. It perhaps would not be difficult to show that no inconsiderable benefit has resulted to our people from the rebuilding of the burnt district in Boston. I do not see that these benefits differ at all, unless it may be in degree, from those which would result from the building of a dam and mills for the manufacture of cotton and woolen goods just over the line in Massachusetts, 'and I do not think they are such as could have been intended by the act."

Since the purpose is solely to irrigate lands in another state, it is not material that the headgate is to be located but a short distance above the southern boundary line of this state, or that the lands to be irrigated are located just over the line in the adjoining state. It would make no difference in principle if it was proposed to divert the water from some stream in the interior or elsewhere in our state much farther removed from the lands to be irrigated, or if it was proposed to irrigate lands in another state situated at

a greater distance beyond our territorial limits. Nor is the fact material that the diversion will occur below that of any previous appropriation, so far as the right of eminent domain is concerned. We are not here considering, and have not deemed it necessary to consider, the right to divert and appropriate water in this state for the purpose proposed.

The statute under which this proceeding to condemn for the right of way is brought prescribes that "Every person, association of persons, company or corporation (the word 'corporation' including a municipal corporation wherever appearing in this chapter), organized or hereafter organized under the laws of this state, or under the laws of any other state, and legally doing business under the laws of this state, who shall in the course of their business require a way of necessity for reservoirs, drains, flumes, ditches, canals, or electric power transmission lines, on or across lands of others for agricultural, mining, milling, domestic, electrical power transmission, municipal or sanitary purposes, shall have power and are authorized" * * * (Comp. Stat., Sec. 3874.) The authority given is to enter upon any land for the purpose of examining and making surveys for the purposes mentioned, and to hold and appropriate so much real property as may be necessary for the location, construction and convenient maintenance and use of such reservoir, drain, flume, ditch, canal, or electric power transmission line, and the procedure is prescribed in succeeding sections for the appropriation and condemnation of the land so required. It is a familiar elementary principle that the laws of a state have no extra-territorial effect. And it is not necessary for a state statute to contain words expressly confining its operation within the state. That it is so confined is generally understood. It is therefore not a strained construction of the statute conferring authority to appropriate and condemn land for a right of way for a ditch for agricultural purposes, that it is intended to be confined not only to a right of way within the state, but as well to agricultural purposes within the state. The authority is no doubt conferred to encourage

agriculture within the state. If the legislative power exists
to make the authority broader than that, and extend it to
agricultural purposes beyond the boundaries of the State, it
should be so extended, if at all, by the legislature, and by
words clearly showing an intention to do so. In a con-
curring opinion in Salisbury Mills v. Forsaith, *supra*, it was
said: "It is one of the plainest elementary rules, that no
legislature can extend its laws to territory beyond the borders
of its own state. How, then, can the courts of this state
have any jurisdiction over dams and mills in another state?"
And in Wooster v. Great Falls Mfg. Co., *supra*, it was said
by the court: "All legislation is necessarily territorial. The
statutes of a state are binding only within its jurisdiction.
The legislature cannot, if they would, authorize acts to be
done in a foreign territory. * * * They cannot affect or
control property elsewhere, and it is not to be presumed they
intended to exceed their jurisdiction." Mr. Justice Story,
in Farnum v. Blackstone Canal, 1 Sumner, 62, Fed. Cas.
No. 4,675, remarked: "Every legislature, however broad
may be its enactments, is supposed to confine them to cases
or persons within the reach of its sovereignty."

Again, it might be difficult to find authority in this statute
to condemn land for the benefit of the business of a foreign
corporation conducted exclusively in another state. What
is meant by the words, "who shall in the course of their busi-
ness require a way of necessity," &c., in immediate connec-
tion with the provision authorizing the taking of land for a
reservoir or ditch for agricultural purposes by a foreign
corporation "legally doing business under the laws of this
state"? Was it intended or not that the right of way should
be required only in the course of the business legally done,
or to be legally done, by the foreign corporation under the
laws of the state? Our laws do not control the affairs of
a foreign corporation within the state where it is incorpor-
ated, but only its business within this state. The construc-
tion and maintenance of the ditch in this state by the pe-
titioner would seem to be merely incidental to its business

of irrigating and cultivating lands for agricultural purposes in Colorado. Is that, then, a business to which the statute refers in authorizing the taking of land for a right of way in this state when required by a foreign corporation in the course of its business, in view of the provision of the section extending the authority to a foreign corporation "legally doing business under the laws of this state," or is that authority conferred upon such corporation for any business wherever carried on? These questions seem to be pertinent, but we need not do more than suggest them, for we are satisfied upon the other grounds above stated that the petitioner has shown no right under the Constitution or statutes of this state to condemn the land in controversy. For that reason the demurrer should have been sustained, and for the same reason the facts stated in the amended petition are insufficient to support the judgment. The judgment, therefore, must be reversed, and the cause will be remanded with directions to vacate the order and judgment confirming the report of the commissioners and granting the right to take and use the land of the defendant below for the purpose specified in the amended petition, and enter the proper order or judgment denying that right in accordance with the views and conclusions herein expressed.    *Reversed.*

SCOTT, C. J., and BEARD, J., concur.